# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 17, 2015 Session

## STATE OF TENNESSEE v. ETHAN ALEXANDER SELF

**Appeal from the Criminal Court for Hawkins County**
**No. 13CR154     Jon Kerry Blackwood, Senior Judge**

_____

### No. E2014-02466-CCA-R3-CD – Filed August 29, 2016

_____

The Defendant, Ethan Alexander Self, was found guilty by a Hawkins County Criminal Court jury of first degree premeditated murder. *See* T.C.A. § 39-13-202 (2014). He was sentenced to life in prison. On appeal, the Defendant contends that (1) the trial court erred in denying his motion to suppress, (2) the State improperly exercised a peremptory challenge to a prospective juror for a race-based reason, (3) the evidence is insufficient to support the conviction, (4) the court erred in denying the Defendant's motions for a mistrial based upon the State's failure to disclose evidence, (5) the court erred in denying his motions for a mistrial based upon the State's eliciting evidence in violation of the court's pretrial evidentiary rulings, (6) the court erred in denying his motion for a mistrial based upon the State's failure to preserve alarm clocks from the victim's bedroom, (7) the court erred in admitting evidence of the Defendant and the victim's good relationship and lack of abuse, (8) the court erred in the procedure by which the jury inspected the gun used in the victim's homicide, (9) prosecutorial misconduct occurred during the State's rebuttal argument, (10) the court erred in failing to instruct the jury on self-defense, (11) cumulative trial error necessitates a new trial, and (12) the trial court improperly sentenced the Defendant. We conclude that there is no reversible error, and we accordingly affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ROGER A. PAGE, SP.J., joined. ROBERT H. MONTGOMERY, JR., J., concurred in part and dissented in part.

John T. Milburn Rogers, Greeneville, Tennessee (at trial and on appeal); Jenny Coques Rogers, Greeneville, Tennessee (at trial and on appeal); Herbert S. Moncier, Knoxville, Tennessee (at trial and on appeal); and Jonathan P. Harwell, Knoxville, Tennessee (on appeal), for the appellant, Ethan Alexander Self.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Anthony Clark, District Attorney General Pro Tempore; Dennis Brooks, Assistant District Attorney General Pro Tempore, for the appellee, State of Tennessee.

## OPINION

The Defendant's conviction relates to the killing of his father, Roger Self, who was a sergeant with the Greeneville Police Department.[1] The victim was shot in the back of his head with his service revolver while lying in bed. The Defendant did not dispute that he shot the victim but contended the shooting was accidental.

At the trial, Greeneville Police Captain Michael Crum testified that he worked as a shift lieutenant on March 24, 2010. He said the victim had been the shift sergeant, which involved working in and maintaining the office, taking calls, dispatching calls, and assisting Captain Crum. He said that the shifts were twelve hours and that the shift lieutenant and sergeant arrived fifteen minutes early to obtain information from the staff of the previous shift.

Captain Crum testified that the victim did not arrive for work at 6:45 p.m. on March 24, 2010, which he said was unusual because the victim normally was punctual. Captain Crum said Captain Beth Dyke brought the victim's absence to Captain Crum's attention. A few minutes after 7:00, Captain Crum called the victim's home telephone and cell phone but received no answer. Captain Crum said that he decided to contact the Defendant but that because he did not have the Defendant's contact information, he called the Defendant's grandmother, Ms. George, who gave him the Defendant's cell phone number.

Captain Crum testified that, due to his working relationship with the victim, he was previously acquainted with the Defendant. Captain Crum said he called the Defendant but did not want to worry the Defendant about the victim not being at work. Captain Crum asked the Defendant if the Defendant had talked to the victim, and the Defendant stated that he had not talked with the victim since morning. Captain Crum told the Defendant that the victim was not at work. Captain Crum said the Defendant stated that he did not think the victim was coming to work and that the Defendant said he and his father had not discussed with which grandparent the Defendant would stay that night while the victim worked. Captain Crum said the victim's custom was to arrange for

---

[1] The trial court granted a change of venue from Greene County to Hawkins County.

a place for the Defendant to go when the victim was working. Captain Crum said the Defendant did not appear to be concerned or fearful during this call.

Captain Crum testified that he asked the Defendant to call "the farm," which was the victim's parents' house. Captain Crum told the Defendant he was concerned the victim might have had a wreck. Captain Crum said the Defendant called him later and told him the victim was not at the farm. Captain Crum asked the Defendant to check on the victim to see if the victim had overslept. Captain Crum testified that the Defendant responded that he was going to a restaurant to get food and to Fellowship of Christian Athletes (FCA) and that the Defendant asked if Captain Crum minded if the Defendant went to check on the victim after those activities. Ultimately, the Defendant told Captain Crum that he had become concerned after Captain Crum mentioned a wreck and was going to drive home to check on the victim. Captain Crum gave different estimates for the time this conversation took place, stating it was around 7:39, 7:40, or 7:49 p.m. He denied that the Defendant cried during this conversation.

Captain Crum testified that he decided to go to the victim's house. He said that while he was on his way, the Defendant called and was crying and upset. Captain Crum said the Defendant stated the Defendant was at home and had found the front door open, the alarm activated, and the house ransacked. Captain Crum said that the Defendant asked him to come to the house and that the Defendant said he "did not want to go in and find his dad." Captain Crum said the Defendant started to say something about his mother being dead and about being scared, but Captain Crum told the Defendant to "hush" and that he would be right there. He agreed it was obvious the Defendant thought something might have happened to the victim.

Captain Crum testified that when he arrived within a couple of minutes, he heard an alarm and saw the Defendant standing near the front steps. He said he went into the house and called out to the victim that he and the Defendant were there in order to avoid startling the victim. He said the Defendant pointed him to the victim's bedroom. He said that he asked the Defendant if the victim slept with a gun and that the Defendant stated he did not know where the victim kept the gun. He said he entered the bedroom with the Defendant behind him. Captain Crum said he and the Defendant continued to announce their presence to try to wake the victim, who was in bed six to ten feet from the door. Captain Crum said he could hear an alarm clock and a notification sound from a cell phone.

Captain Crum testified that as he approached the victim, he saw a wound on the back of the victim's head. He said he was "within inches" when he noticed the victim's wound. He said a blanket or sheet was pulled around and over the victim but did not entirely cover the victim's head. He said he left the bedroom. He said that the

-3-

Defendant, who stayed in the hallway and did not enter the room, asked if the victim was okay and that Captain Crum indicated the victim was not.  Captain Crum said he did not check the victim for signs of life because he was concerned about the Defendant's seeing the victim.  He said he thought the victim was dead.

Captain Crum testified that he and the Defendant went outside the house.  Captain Crum agreed his notes said he had to force the Defendant outside but explained that he tried to get the Defendant to move faster than the Defendant wanted to go.  Captain Crum said the Defendant never stated he wanted to stay inside the house.  Captain Crum said the Defendant cried and appeared upset.  He said the Defendant stated he did not know what he was going to do because both of his parents were dead.  He agreed he had written in his notes that the Defendant "basically collapsed" in Captain Crum's arms.  He said that the Defendant wanted to call the Defendant's grandmother but that the Defendant had been unable to dial his cell phone.  Captain Crum said he called the Defendant's grandmother at 7:40 p.m. and told her that the Defendant needed her to come to the house.  He agreed that the Defendant appeared distraught when he told the Defendant the victim was dead.

Captain Crum testified that Captain Dyke arrived and went inside the house but that he did not go inside with her.  He said that EMS responded and that neighbors and other deputies arrived.  Captain Crum said that after the police chaplain arrived, Captain Crum introduced the Defendant to the chaplain.  He said the Defendant stated he did not have anything to say to the chaplain and to get the chaplain away from him.  Captain Crum said that within an hour, the Defendant left with the Defendant's girlfriend's father.

Captain Crum testified that he had someone notify the sheriff's department about the homicide and that the sheriff's department asked the Tennessee Bureau of Investigation (TBI) to take over the investigation.  He said he had no involvement in the investigation.

Captain Crum testified that he considered the victim his friend.  He said the victim and the Defendant had a close, good relationship.  He said that after the Defendant obtained a driver's license, the Defendant came to the office frequently to see the victim and to get money.  He said that the victim and the Defendant always parted by saying, "I love you," and that the victim often hugged the Defendant or kissed the Defendant's cheek.  He said that children were welcomed in the office and that "we all somewhat raised our kids in the office."  He said the Defendant, the victim, and the Defendant's mother had been to his house for the police department's Christmas dinner during the Defendant's mother's lifetime.  Captain Crum said he never had any indication the victim abused the Defendant.

Captain Crum testified that the Defendant was not employed. He later said he did not know whether the Defendant performed paid labor on the family farm.

Captain Crum testified that he and the victim had not worked the night before March 24, 2010.

Greeneville Police Captain Beth Dyke testified that the victim became a reserve officer in 1992 and a full-time officer in 1996. At the time of the victim's death, she was his shift captain. She said he had last worked the day shift on Monday, March 22, 2010, which ended at 7:00 p.m. She said he was next scheduled to work the Wednesday, March 24 evening shift and should have arrived at 6:45 p.m. She said that she realized he was not there around 7:00 and that she checked the records and with other officers but did not obtain any information about why he was not there. She said she had Captain Crum call the victim's house. She had Captain Crum call the Defendant's maternal grandmother to get the Defendant's telephone number. She said the victim always had the Defendant stay with one set of the Defendant's grandparents when the victim worked overnight. She said that she overheard Captain Crum's conversation with the Defendant and that the Defendant mentioned going to a restaurant and FCA. She said the Defendant thought the victim was not supposed to work that night. She said Captain Crum told the Defendant to call his paternal grandparents to see if the victim was at the farm.

Captain Dyke testified that she told Captain Crum to go to the victim's house to make sure nothing was wrong. She said that after Captain Crum left, he contacted her by radio and told her she should go to the victim's house because the Defendant had found the door open, had seen personal property on the floor, and had been afraid to go inside. She said that when she arrived, Captain Crum was crying and the Defendant was "somewhat crying." She said she went inside and knew immediately that something was wrong because the house was in disarray, which was not its usual state. She said she went to the victim's bedroom and found the body on the bed with the comforter over the victim's head. She saw a hole in the comforter where it covered the back of the victim's head. She heard an alarm clock blaring and alerts from two cell phones, all of which she saw on a bedside table. She acknowledged she stated in a written report that the alarm was sounding and that cell phones and the home telephone were ringing. She said she did not turn off the alarm or answer the telephones. She said she walked around to the other side of the bed and saw massive amounts of blood and the victim's disfigured face. She recognized the wound as having been inflicted by a gunshot. She said the door was three to four feet from the body. She searched the room for a gun but did not find one. She saw jewelry that had belonged to the Defendant's deceased wife in a case on the dresser. She said "stuff" was on the floor.

Captain Dyke testified that she saw an earring in the hallway and "stuff" on the kitchen floor. She saw a credit card and a billfold on the kitchen floor. She said she went outside and "whispered and mouthed" to Captain Crum that the victim was dead. She said the Defendant stood five to six feet away and could not have heard her. She notified Chief Terry Cannon that an officer had been killed. She also called the Greene County sheriff because the victim lived in the county. She said deputies Jimmy Morgan and Eddie Yokley arrived, followed by Detective Mike Fincher and another detective. She was not involved in the collection and preservation of evidence.

Captain Dyke testified that she had known the victim since high school, thirty to thirty-five years. She said they had visited in each other's homes and had gone out to eat with a group. She said they had seen each other on vacation when their respective families stayed at the same hotel. She said she had seen the Defendant come to the office to bring food to the victim, get money, and borrow the victim's debit card. She said she never saw any signs of abuse in the Defendant, the victim, and the Defendant's mother's relationship. She said that before the victim's death, the Defendant's mother, who was married to the victim, died unexpectedly at work.

Captain Dyke testified that she was a firearms training officer. She identified a document that reflected the victim had been assigned a "full size Glock model []22 forty caliber" and the weapon's serial number, CXB684. She was unaware of the victim's service weapon having two serial numbers and agreed it would be unusual. She identified a photograph of a holster assigned to officers on desk duty. She said the holster required "a couple of maneuvers" in order to remove the weapon. She said that she had previously examined the holster depicted in the photograph and that it worked properly. Captain Dyke also identified a holster and said it had been assigned to the victim.

Captain Dyke testified that if the victim's service weapon were malfunctioning in a manner that caused it to "stovepipe,"[2] the information would have been noted on the firearms sheet during the certification Captain Dyke made relative to the weapon in 2009. She agreed the firearms sheet contained no notes of such a malfunction. She was unaware of any stovepiping problem with the victim's service weapon.

Captain Dyke acknowledged that she wore a bracelet memorializing the victim and that she had ordered the memorial bracelets for all Greene County law enforcement officers. She acknowledged she was emotional about the case.

---

[2] According to other proof, a "stovepipe" occurs when a weapon malfunctions when it is fired, preventing a casing from ejecting properly before the next round of ammunition slides into the chamber.

Captain Dyke testified that the victim did not seem dissatisfied with his job at the time of his death and that he was not having any problems at work. She agreed that in 2009, Greeneville Police Detective Vericki called for a welfare check on an individual when the victim was working as the dispatcher. She agreed that the victim did not dispatch an officer, that an officer was not dispatched until the next morning, that the individual was found deceased, and that the victim was disciplined for the incident. She agreed that the victim was normally punctual but that he had been tardy for work a few times.

Captain Dyke testified that the Defendant seemed "normal" and did not have any apparent problems before the victim's death. She said the victim and the Defendant went to the family farm frequently, that the Defendant helped the victim on the farm, and that she did not know whether the victim paid the Defendant for the labor. She said the Defendant was an only child and that he been close to both of his parents. When asked how the Defendant coped with his mother's death, she said she had not seen him cry at his mother's wake. She said that after the Defendant's mother's death, the Defendant was friendly and spoke to her when he came to the police department. She said she did not see any changes in the Defendant after his mother died.

Washington County/Johnson City Emergency Medical Service Field Paramedic Mark Copus testified that he worked as a paramedic for Greene County/Greeneville Emergency Medical Service on March 24, 2010. He said that in the latter capacity, he responded to the scene of a shooting at 7:46 p.m. on that date. He said the paramedics were escorted inside by a police officer and that the house appeared to have been ransacked. He said that to the best of his knowledge, a blanket covered the victim's body but not the victim's head. He said that a gunshot wound to the back of the head was apparent when he and the officer removed the blanket and that the victim was deceased. He said the victim appeared to have been sleeping when the victim was shot. Mr. Copus said that based upon the victim's lack of cardiac activity and the extent of the victim's injuries, no resuscitation was possible. He did not recall hearing an alarm or ringing telephones in the bedroom.

Chuck Jeffers testified that he and the victim had been friends since Chuck Jeffers was a high school freshman and that they were like brothers. He said that he had known the victim's deceased wife since kindergarten, that he had introduced them, and that he had been in their wedding. Chuck Jeffers said that he had known the Defendant since the Defendant's birth and that the Defendant had been close to the Defendant's parents.

Chuck Jeffers testified that on March 24, 2010, he received a call from the Defendant's maternal aunt, that she told him the victim was dead and the Defendant

-7-

needed him, and that he went to the Defendant's maternal grandmother's house around 9:20 to 9:25 p.m.

Chuck Jeffers testified that Ms. George, who was the Defendant's maternal grandmother, the Defendant, the Defendant's girlfriend, and the Defendant's Aunt Beth were present. Chuck Jeffers said that when he arrived, the Defendant was crying and shaking uncontrollably and that the Defendant stated, "Momma's gone and now Daddy's gone, what am I gonna do?" Chuck Jeffers said that he asked the Defendant what happened and that the Defendant stated he had gone home after practice and found the victim asleep and snoring. Chuck Jeffers said the Defendant was taking deep breaths. Chuck Jeffers said the Defendant stated that the Defendant left to eat and that when the Defendant returned, the police were looking for "him" and that something was not right. Chuck Jeffers said the Defendant stated he found the door open when the Defendant went home, that the Defendant looked in and saw the house in disarray, and that the Defendant "got scared and went back out." Chuck Jeffers said the Defendant lost control of his emotions and did not say anything else about what had happened. He said they both cried. He said Captain Crum arrived at some point but did not recall when. Chuck Jeffers called his father, a retired Greeneville police officer, who came to Ms. George's house about twenty minutes after Chuck Jeffers arrived. He said that after forty-five to fifty minutes, his father drove himself, the Defendant, and the Defendant's Aunt Beth to the sheriff's department to give statements. He said that the Defendant was in the back of the sheriff's department for a long time, that they waited for him in a waiting area, and that he was released "well after midnight." He thought the Defendant left with the victim's sister and the sister's friend. He agreed that he and his father gave statements.

Chuck Jeffers testified that on March 25, 2010, the Defendant's Aunt Beth called him because the investigators wanted to take the Defendant through the victim's house to establish the timeline of events. Chuck Jeffers said he went to the victim's house and waited outside during the process. He said the Defendant showed no emotion. He said that the Defendant went into the house twice, that the Defendant brought some of the Defendant's personal items from the house to Chuck Jeffers, that the Defendant said, "I love you," that the Defendant could not look Chuck Jeffers in the eye, and that he had not spoken to the Defendant since then. Chuck Jeffers said the personal items included some cologne and shirts. He said the Defendant's retrieving the cologne "kind of bothered" him.

Chuck Jeffers testified that he noticed a difference in the Defendant's behavior after the Defendant's mother died, that Chuck Jeffers never saw the Defendant cry after the death, that Chuck Jeffers had been alarmed by the Defendant's lack of emotion about the death, and that Chuck Jeffers talked to the victim because Chuck Jeffers thought the

Defendant might need help. Chuck Jeffers was unaware of the victim's having taken the Defendant to counseling but said the Defendant improved over time.

Chuck Jeffers testified that the victim sometimes talked to the Defendant by telephone when Chuck Jeffers and the victim were together and that the victim always ended the call by saying, "I love you." Chuck Jeffers said the Defendant and the victim worked together on the family farm. Chuck Jeffers said that shortly before the victim's death, the Defendant and the victim had gone to an amusement park and that they had a good time. Chuck Jeffers thought the victim and the Defendant were financially secure because they had the proceeds of the Defendant's mother's life insurance policy and the victim's salary.

Chuck Jeffers testified that in his opinion, the victim overindulged the Defendant. Chuck Jeffers said the Defendant always had the latest video gaming consoles. Chuck Jeffers said the victim purchased a car for the Defendant and purchased a Jeep for the Defendant after the car was involved in a wreck. Chuck Jeffers said he received training in identifying child abuse in his capacity as a Sunday school teacher and that he never saw evidence the Defendant was abused.

Chuck Jeffers testified that the Defendant wanted to go to college in Chattanooga because the Defendant's girlfriend would be attending college there and that the victim preferred for the Defendant to stay closer to home. Chuck Jeffers said that the victim had asked Chuck Jeffers's opinion and that Chuck Jeffers expressed his support of the Defendant going to school in Chattanooga. Chuck Jeffers said he was unaware of disagreements about other matters between the victim and the Defendant, but he also said the Defendant and the victim had argued about the Defendant's wanting to be with the Defendant's girlfriend. Chuck Jeffers said the Defendant lied to the victim about the girlfriend.

Charles Jeffers, Chuck Jeffers's father, testified that he worked for the Greeneville Police Department for thirty-five years before his retirement. He said that he had worked with the victim but that they did not see each other often because they were on different shifts. Charles Jeffers said he had known the victim but was not around the Defendant often. Charles Jeffers said that after he learned of the victim's death from his son, he went to Ms. George's house because he was concerned about Chuck Jeffers. Charles Jeffers said he knew Chuck Jeffers and the victim had been close friends.

Charles Jeffers testified that when he arrived at Ms. George's house, he saw the Defendant standing at the top of the steps, went inside to console the Defendant, and then went outside. Charles Jeffers said that he did not see the Defendant express any emotion

and that the Defendant would not look at him. Charles Jeffers said Chuck Jeffers was no longer crying when he arrived.

Charles Jeffers testified that he took the Defendant, Chuck Jeffers, and an unknown woman to the sheriff's office. He said he waited "quite a while" as the Defendant gave a statement.

Angie Weems, the Greene County Sheriff's Department evidence technician crime scene processor, testified that she took custody of a gun retrieved by a "dive team." She said the gun was attached with plastic ties to a brick. She identified three bullets she received from the evidence laboratory, a "cartridge and stovepipe in action," a plastic tie, a bullet found near the victim's body, metal fragments recovered from the victim's brain during the autopsy, metal fragments recovered from a pillow, and a "for sale" sign from the victim's living room couch.

Ms. Weems testified that in the early morning hours of March 25, 2010, she obtained cell phones from the Defendant and C.P.[3] She said she and Detective Fincher photographed text messages stored in the cell phones. The cell phones were received as exhibits.

Karen Cline-Parhamovich, D.O., an expert in forensic pathology, testified that she conducted the victim's autopsy. She said that the cause of death was a gunshot wound to the head and that the manner of death was homicide. She said the shot entered the back of the victim's head and exited the left forehead. She said the range from which the shot was fired was indeterminate, meaning it could have been "a few feet to distance." Although she did not find stippling, the presence of which would indicate a shot fired from "within a few feet," Dr. Cline-Parhamovich stated that a quilt over a person's head could filter out gunpowder residue that might otherwise cause stippling. She acknowledged she could not determine the distance from which the shot had been fired at the victim. She identified remnants of ammunition she removed from the victim's head.

Greene County Sheriff's Detective Mike Fincher, the lead detective in the case, testified that he had known the victim but had not known him well. Detective Fincher said he had not known the Defendant before the victim's death. Detective Fincher said he responded to the scene around 8:15 p.m. on March 24, 2010. He said that law enforcement officers and others were in the yard and that he moved them to the street to enlarge the area being preserved for investigation.

---

[3] The record reflects that C.P. was a high school student at the time of the relevant events. Although the record does not reflect whether she was a minor at the time, we elect to refer to her by her initials.

Detective Fincher testified that the house was in disarray with items from cabinets on the floor and jewelry in the hallway. He said that the victim was in the bedroom and that he heard noise from an alarm clock and two ringing cell phones. He said that the cell phones, one of which belonged to the Greeneville Police Department and one of which was the victim's personal cell phone, were removed from the house and examined. He said that relative to the missed calls on March 24, 2010, the cell phones showed calls from several individuals whose names were listed in the call log and from a restricted number. Detective Fincher said the victim's cell phones both had alarms set for 2:00 p.m.

Relative to the bedroom, Detective Fincher testified that dresser drawers were opened, clothes had been thrown on the floor, and a jewelry box was opened. He said they found medication and the victim's wallet in the kitchen. He was unaware of the victim's taking testosterone supplements. He said that they searched for weapons and found a gun but that it was not the gun from which the shot that killed the victim had been fired. He said they found the victim's police gun belt on a coat rack in a computer room. He identified photographs taken inside the home, which were received as exhibits.

Detective Fincher testified that the Defendant revealed the location of the gun involved. Detective Fincher said that on March 26, 2010, a law enforcement dive team recovered the gun, which was attached to a brick, from a pond in a Greeneville park. He said that the slot on the weapon was "partially pushed back" and that a "stovepipe" round was stuck in the action. He identified the weapon as a .40-caliber, Model 22, semi-automatic handgun and said it was the standard weapon issued by the Greeneville Police Department and the Greene County Sheriff's Department.

Detective Fincher testified that he went to Ms. George's house to talk to the Defendant around 10:00 p.m. on March 24, 2010. He said he wanted to talk to the Defendant because the disarray at the victim's house appeared staged, the victim did not appear to have struggled, and the Defendant lived with the victim. Detective Fincher said the Defendant had just taken a shower, which Detective Fincher thought was unusual. Detective Fincher said a person might shower to remove evidence such as gunshot residue, trace hair evidence, or blood spatter, but he acknowledged that a person might shower after vomiting or crying. He said that the police collected and examined the clothing the Defendant had worn before the shower and that the clothing did not contain visible bodily fluids. Detective Fincher said that the Defendant was polite and "very removed" and that he did not see the Defendant cry. Detective Fincher said that he asked the Defendant to come to the sheriff's office to be interviewed and that family members brought the Defendant to the office. Detective Fincher said the interview lasted several

hours, beginning sometime after 10:00 p.m. and ending around 2:00 a.m. Detective Fincher agreed that the Defendant was free to leave after the interview.

Detective Fincher testified that they asked the Defendant to meet them the next morning to walk through the victim's house. Detective Fincher said they had questions about the missing firearm and any other items that might have been missing. He said that although it was difficult to describe the Defendant's demeanor, the Defendant was not "terribly upset," did not cry, and would not look at the officers much. Detective Fincher said the only item other than the gun that the Defendant identified as missing was an iPod from the Defendant's bedroom. Detective Fincher said the Defendant gathered some clothing and other items to take with him.

Detective Fincher testified that he had heard officers talk about the victim's having failed to dispatch an officer to respond to a call for a welfare check but said he never had any conversations about the matter with the victim or the family members of the person who was the subject of the welfare check.

Detective Fincher testified that the gun was loaded when it was recovered from the pond. He said the slide was "back" and that the gun contained a shell casing "sticking up out of it." He said that if the stovepipe round had been removed, the gun would have been ready to fire. He explained that a stovepipe occurred when an individual did not hold the gun properly when firing it or when ammunition with insufficient firepower was used.

TBI Special Agent Forensic Scientist Melanie Carlisle testified that she led the Violent Crime Response Team that processed the crime scene for evidence. She identified a bullet she collected from a pillow underneath the victim's body. She said that when the team arrived around 12:20 a.m. on March 25, 2010, no alarm clock was sounding in the bedroom where the victim's body was located. She said that they later noticed two alarm clocks in the bedroom, that the clock on the right side of the bed if standing at the foot of the bed was set for 3:30 p.m, and that the clock on the left side of the bed if standing at the foot of the bed was set for 4:30 p.m. She said she did not collect the alarm clocks as evidence because they did not have any forensic value. She acknowledged she did not look for a second alarm on the clocks. She said that although she collected two cell phones from a nightstand, she did not look at them to determine the time and frequency of any alarms set on the phones, whether any text messages had been received, and whether any incoming calls had been received by the phones.

Agent Carlisle testified that she was told the police who arrived on the scene before her had pulled down the bedcovers from the victim's body to look for a weapon and that the bedcovers were pulled down when she arrived. She agreed she had been told

the bedcovers had been over the victim's head previously. She agreed she took custody of a comforter and a sheet that had reddish-brown stains but did not recall if she saw two holes in the comforter. She agreed that the location of the reddish-brown stain on the comforter could be consistent with the location of the victim's head before the comforter was pulled down. When shown a photograph of the comforter, she noted reddish-brown stains and two holes. She said that no testing was done to determine if the holes were made by a bullet and that no testing was done to determine whether the reddish-brown stain was blood.

Agent Carlisle testified that she did not recall seeing bodybuilding nutritional supplements in the kitchen. She said that she did not consider pills or supplements to have forensic value and that she and her team would not have collected them. She said the supplements shown in photographs of the scene would have been at the scene when she left.

TBI Special Agent Scotty Ferguson, the agent in charge of the investigation, testified that he was contacted by Greene County Sheriff's Captain John Huffine around 8:45 p.m. on March 24, 2010, regarding a death requiring TBI investigative assistance. Agent Ferguson said he responded to the scene around 9:30 p.m., where he met with Captain Huffine and the sheriff. Agent Ferguson said Detective Fincher, Angie Weems, and Jeff Morgan were inside the house. He did not see the Defendant. After viewing the scene, he determined that the TBI crime laboratory should be called to the scene to collect evidence, and he left the scene before they arrived.

Agent Ferguson testified that he and Detective Fincher went to the sheriff's office and interviewed the Defendant, who had been transported to the office by family and friends. He said that initially, he wanted to gather information, such as time lines and other relevant information, that could help with the investigation. He noted that the Defendant was the person who found the victim. Agent Ferguson said the *Miranda* warnings document reflected it was signed at 10:59 p.m. and that the interview began around 11:00 p.m. He described the Defendant as "very cooperative." Agent Ferguson said he wrote a statement that the Defendant reviewed and signed.

Agent Ferguson read from the written statement he prepared from the interview. Agent Ferguson testified that the Defendant stated the following: The Defendant had been at track practice until 4:50 or 4:55 p.m., and when he arrived home, he heard the victim snoring. The Defendant took twenty dollars from the victim's wallet in the kitchen and did not go into the victim's bedroom. The Defendant looked for headphones in his bedroom but could not find them. He watched television, did laundry, and exchanged text messages with his girlfriend. He was at the house for about forty-five minutes before he went to his grandmother's house. When he left, he first tried to leave

in the victim's Jeep but could not get it out of the driveway and, instead, left in the Defendant's Jeep. The Defendant stayed at his grandmother's house until about 6:15 to 6:20 p.m. The Defendant drove around after leaving his grandmother's house. Around 7:00 p.m. when the Defendant was on his way to a restaurant, he received a call from Captain Mike Crum regarding the victim's whereabouts. The Defendant called the victim's telephone numbers but did not receive an answer. He called his paternal grandparents to see if the victim was at the farm, but the victim was not. The Defendant went home.

Agent Ferguson testified that the Defendant also stated: The Defendant arrived home around 7:12 p.m. The front door was open, and he heard the victim's alarm sounding. The house was "a wreck," and the Defendant became scared. The Defendant did not look into the hall toward the victim's bedroom, and the Defendant went outside and called Captain Crum, who came to the house. They entered the house. Captain Crum went into the victim's bedroom then took the Defendant outside. Captain Dyke and EMT personnel arrived.

Agent Ferguson testified that the Defendant stated a homeless Caucasian man with a beard and a hat used to walk on the street in front of the house. The Defendant stated that their dog had been beaten about one month earlier and that after the beating, the homeless man was not seen again.

Agent Ferguson testified that the Defendant stated the Defendant's mother died about two and one-half years earlier, shortly before the Defendant's sixteenth birthday. The Defendant stated that the victim had been dating a married woman and that the Defendant had looked at the victim's cell phone and seen calls and text messages. The Defendant had met the woman but could not recall her name. He said that the woman had been at the house earlier in the month and that he had eaten in restaurants with the victim and the woman. The Defendant also stated that the victim dated a woman from Kentucky. The Defendant said the victim dated "quite a bit" but did not want a serious relationship. The Defendant stated that a woman had been at the house "around Monday" and that he could smell perfume.

Agent Ferguson testified that the Defendant stated the victim had experienced stress and "a lot of problems" at work recently. The Defendant stated that the victim had been upset about promotions at work and that the victim had difficulty sleeping due to the twelve-hour shifts the victim worked.

Agent Ferguson testified that the Defendant stated the Defendant and the victim had not had problems recently and had been talking about colleges. The Defendant stated that the victim wanted the Defendant to go to East Tennessee State University or Carson-

Newman University but that the Defendant wanted to go to University of Tennessee at Chattanooga (UTC). The Defendant said that Mike Knapp had called the victim the previous Saturday and said the Defendant had been drunk at a movie theater but that the Defendant and the victim talked about it when the Defendant came home and that the victim appeared to believe the Defendant.

Agent Ferguson testified that the Defendant stated that the victim usually left the victim's "duty belt" on the couch "or somewhere" and that the victim put his service weapon elsewhere, although the Defendant did not know where the victim kept the gun.

Agent Ferguson testified that the Defendant was calm and cooperative, did not cry, did not show a lot of emotion, and answered all of the questions the Defendant was asked during the interview. Agent Ferguson said the Defendant appeared concerned but did not seem scared. Agent Ferguson said that the Defendant requested seven changes to the statement and that the Defendant initialed the changes after they were made. Agent Ferguson said the Defendant appeared to know what he was doing when he made the statement.

Agent Ferguson agreed that although the Defendant denied killing the victim, Agent Ferguson did not write this in the statement. Agent Ferguson said that he returned to the scene after taking the statement and that he interviewed other family members and friends during the investigation.

Agent Ferguson testified that the police wanted the Defendant to look at the house for missing items and that the Defendant wanted some items from the house. Agent Ferguson said he talked to the Defendant the day after the homicide when they were both at the house. Agent Ferguson said that he had no conversations with the Defendant other than during the interview and at the house on March 25, 2010.

Agent Ferguson acknowledged a report created during the investigation which noted that the television had been on a cartoon show when investigators were at the house.

TBI Assistant Special Agent in Charge of Upper East Tennessee Shannon Morton testified that on March 25, 2010, he met with investigators at the scene as the Violent Crime Response Team was finishing its processing of the scene. Agent Morton said that Agent Ferguson took him through the house, that the house was in disarray, and that it appeared cabinets had been opened and contents raked out onto the floor and thrown about.

Agent Morton testified that at Agent Ferguson's request, he spoke with the Defendant at the sheriff's office on March 25, 2010, after having reviewed the written statement the Defendant had given the previous evening. He identified a Greene County Sheriff's Department waiver of rights form the Defendant signed and said either he or Greene County Detective Morgan read the rights waiver to the Defendant. He identified a second rights waiver form the Defendant signed, which he said was used by the TBI and contained slight wording variations from the Greene County form. Agent Morton said the Defendant's oral account of the relevant facts was largely consistent with the Defendant's prior statement.

Agent Morton testified that after a break, he took a written statement from the Defendant around 5:30 p.m. Agent Morton said the Defendant stated: On Tuesday before the victim's death, the Defendant and the victim had a disagreement about towels the Defendant had used after his shower. The Defendant stated that the victim had awakened the Defendant at 2:00 or 3:00 a.m. and had yelled and cursed at him. The Defendant stated that the victim called him stupid and worthless, rubbed the towels in his face, and threw the towels on the floor. The Defendant stated that he woke the next morning, showered, and asked the victim for money for breakfast because there was no food in the house. The Defendant stated that the victim said the Defendant was stupid and worthless and did not have a job. The Defendant stated that the victim said he "did all this stuff" when he was the Defendant's age and that the victim threw ten dollars in the floor and told the Defendant to "make do with it." The Defendant stated that he left for school, picked up his girlfriend, went to McDonald's, and sent a text message to the victim that the Defendant would do laundry, make coffee, and fix the victim's uniform when the Defendant got home. The Defendant stated that the victim would not send him text messages when the victim was mad. The Defendant stated he did not call the victim after school in order not to wake the victim. The Defendant stated he and his girlfriend went to her house to get her running gear and went to track practice. The Defendant stated that after track practice, he went home around 4:40 p.m. The Defendant stated the victim was in the shower but told the Defendant after coming out of the shower that the Defendant needed to do laundry. The Defendant stated the victim told him the victim was going to bed and to wake him at 5:45 p.m. The Defendant stated he forgot to wake the victim. The Defendant stated the victim woke around 5:55 p.m. and cursed at him, asked why the Defendant did not wake the victim, and shoved the Defendant's head into a recliner and said the victim was going to lie down.

Agent Morton testified that the Defendant stated he was going to show the victim "who the bigger man was" and that he went to the computer room to get the victim's gun. The Defendant stated that he went into the victim's bedroom, that he turned on the light, that the Defendant had his finger on the gun's trigger, and that the Defendant had never shot the gun but thought it had a safety. The Defendant stated that the victim stopped

snoring, that he thought the victim was awake and aware of the Defendant's presence, that the Defendant was startled when the victim snored again, and that the gun went off. The Defendant stated that he had intended to wake the victim and ask if the victim thought it was "cool" to yell at and beat the Defendant. The Defendant stated he was six to eight feet from the victim when the shot was fired. The Defendant stated that when he entered the room, the victim had bedcovers over his head and faced away from the Defendant. The Defendant stated he panicked because he did not mean for this to happen, that he almost became sick, that he turned off the light and left the room, and that he decided to try to make it appear someone had broken into the house.

Agent Morton testified that the Defendant stated he went to his grandmother's house and stayed for about fifteen minutes before driving to a park and disposing of the gun, which he had tied to a brick to prevent it from floating. The Defendant stated that he drove around to think and that Captain Crum called him. The Defendant stated he stopped to zip down the windows in his Jeep because he knew the victim would be mad if the victim saw them up. The Defendant stated he did not know how the victim was, that he went home and went inside the house, that he wanted to see if the victim was okay, and that he could not go to the back of the house. The Defendant stated that Captain Crum arrived shortly thereafter and that they went into the house. The Defendant stated that Captain Crum went into the bedroom, came out, and took the Defendant outside. The Defendant stated that Captain Crum asked the Defendant about the Defendant and the victim's relationship, that the Defendant said it was "crappy," and that the Defendant said he was yelled at or physically struck if he did not do things exactly right.

Agent Morton testified that the Defendant recounted several incidents involving the victim's using physical and verbal discipline or force. The Defendant recalled an incident in which he had an empty twenty-four pack of beer in his Jeep. The Defendant told Agent Morton that it was from a party, that he had not consumed any, and that he forgot to throw it away. Defendant stated that the victim found it when the Defendant was not home and would not believe it was not the Defendant's. Agent Morton said the Defendant stated that he had been afraid to go home and that when he did, the victim had cursed at him, grabbed him, threw him against a wall, and smacked him. Agent Morton said the Defendant stated that on another occasion, he had been at a movie theater, that Michael Knapp told the victim that the Defendant had been drinking, and that when the Defendant arrived at home, the victim was outside waiting and smacked him. Agent Morton said the Defendant stated that on another occasion, the victim poked the Defendant in the chest and that when the Defendant poked the victim's chest in response, the victim kneed the Defendant in the groin. The Defendant stated that his testicle swelled but that the victim would not let him see a doctor and told the Defendant he would do it again if the Defendant told anyone. The Defendant stated that the victim had rubbed the victim's face in chocolate the Defendant spilled and that he told the Defendant

it would teach him to make a mess. The Defendant stated that the victim claimed he had never loved the Defendant's mother, that it was the Defendant's fault she died, and that the victim should have been the last one to talk to the Defendant's mother. Agent Morton said the Defendant stated that if the Defendant lost a wrestling match, the victim held the Defendant to the ground and that the Defendant had to beg the victim to get off him. The Defendant claimed he told a girlfriend about the victim's verbal abuse. Agent Morton said the Defendant stated the victim grabbed the Defendant's finger and bent it after the victim caught the Defendant making an obscene gesture. The Defendant stated he thought the finger was broken but was not permitted to seek medical treatment. The Defendant stated that the victim stomped the Defendant's big toe and broke it and that the Defendant later told an emergency room doctor he had hit his toe on a door. The Defendant stated that if he had a bruise or a black eye, he had to say it was from wrestling. The Defendant's March 25, 2010 statement was received as an exhibit. Agent Morton said he and TBI Agent Mike Hannon were the only individuals present when the statement was taken.

Agent Morton acknowledged that notes he created on March 26, 2010, the day after he took the Defendant's statement, stated that the Defendant had said the shooting was an accident. Agent Morton acknowledged he had not used the word "accident" in the Defendant's written statement. He agreed that before the written statement was taken, the Defendant asked hypothetical questions about an accidental or justifiable shooting and that the Defendant then said the shooting had been an accident and that the Defendant did not mean for it to happen. Agent Morton said his notes reflected what the Defendant had said at a certain point and that when the written statement was created thereafter, the Defendant had not used the words "accidental shooting." Agent Morton said the written statement was taken from approximately 2:53 until 6:53 p.m.

William Storm Wilson, a UTC student, testified that he and the Defendant were high school classmates and friends. Mr. Wilson said he and the Defendant became acquainted in a weightlifting class at the beginning of their senior year. Mr. Wilson said he and the Defendant played video games at Mr. Wilson's house and went out to eat together. Mr. Wilson said the Defendant was not employed but had money when they did anything that required money. Mr. Wilson said he and the Defendant were both interested in physical therapy. Mr. Wilson thought the Defendant was interested in attending UTC. Mr. Wilson thought the Defendant's then-girlfriend was also interested in attending UTC, although he could not recall if he and the Defendant discussed it. Mr. Wilson did not see any indication the Defendant had been abused or beaten. Mr. Wilson thought the Defendant mentioned a past wrist injury from wrestling. Mr. Wilson said the Defendant did not wrestle his senior year but may have wrestled in middle school or as a freshman. Mr. Wilson said the Defendant did not participate in extracurricular activities and was "just working out." Mr. Wilson said the Defendant did not talk about the victim

and that his only exposure had been when the Defendant spoke to the victim by telephone. Mr. Wilson said the Defendant had been respectful to the victim on the telephone. Mr. Wilson said the Defendant usually went home around 9:00 or 10:00 p.m. and sometimes received calls to come home. He agreed the Defendant kept personal matters to himself. He agreed the Defendant sometimes stepped out of the room during telephone conversations with the victim. He agreed he never heard about the Defendant and the victim's disagreeing about where the Defendant would attend college. Mr. Wilson agreed that he never saw the Defendant angry or aggressive and that the Defendant was a good student.

Knox County Sheriff's Deputy Timothy Belcher, a diver for the underwater recovery team, testified that on March 25 or 26, 2010, the team went to Greeneville to recover a weapon bound to a brick. He was the primary diver and recovered a Glock pistol from a pond in the location in which he had been instructed to look. Deputy Belcher said he had been advised that the weapon had a stovepipe round in it, meaning the weapon had malfunctioned when it fired and had a casing that had not ejected properly before the next round slid into the chamber. He said the weapon he recovered was in this condition. He said they kept the weapon in water and stored it in a container, which was in accord with the team's training. He agreed the weapon he recovered was a brand used by law enforcement and that he carried the same type of Glock 22, .40-caliber weapon. He agreed that this type of Glock weapon had an external safety but would fire if the trigger were pulled. He agreed the weapon was designed not to fire if dropped or if trauma occurred to it.

Detective Mike Fincher was recalled and identified photographs of the Defendant's Jeep taken at the victim's house during the crime scene investigation. Detective Fincher said that photographs depicted a duffel bag in the Jeep's floorboard and twenty-one dollars in the Jeep's center console. He identified a photograph of a for sale sign that said "2007 low miles, soft top, 620-4198." He said the sign had been on the victim's living room couch. He said the investigation showed that the vehicle described in the sign was the Defendant's Jeep and that the telephone number was that of one of the victim's cell phones.

Detective Fincher testified that the Defendant and the Defendant's girlfriend, C.P., signed consent forms to allow the police to inspect their cell phones. He said he and Angie Weems reviewed and photographed the text messages stored on the cell phones. Detective Fincher read the text messages into evidence. The messages indicate the Defendant and C.P. sent and received messages to each other on March 24 and 25, 2010, which included the following: At 4:09 p.m. on March 24, the Defendant indicated in a text message that he was at home doing the victim's laundry and that he planned to visit C.P. They discussed that they both had leg pain and that the Defendant got mad about

-19-

people "clapping and laughing." They also discussed the girlfriend's employment duties that day and a dress she received. At 5:56 p.m., the Defendant apologized for the amount of time he was taking and said he had to "do dad's uniform." At 6:38 p.m. the Defendant stated in a text message that the victim was going to work late and was going to let the Defendant "drive the Jeep." At 6:44 p.m., the Defendant stated in a text message that he was "on [his] way." At 7:40 p.m., C.P. sent the Defendant a text message stating she had asked her father to call an emergency room for the Defendant. At 7:41 p.m., the Defendant sent her a text message stating, "Dad is gone." The text messages reflect that the Defendant and C.P. continued to send messages to each other later in the evening, that they professed their love for each other, and that an unidentified person called C.P.'s house about taking her cell phone.

Detective Fincher testified that a photograph of the victim's bedroom showed an alarm clock that displayed 1:49. He did not recall having seen an alarm clock on the other side of the room. He agreed that no alarm clocks were collected as evidence. He agreed that shortly after the victim's death, the victim's sister, Becky Self, received permission to take items from the home and that the items from the house were sold at an auction.

Detective Fincher testified that the information about the gun's specific location in the pond was not in the Defendant's written statements. Detective Fincher agreed the information was important.

Detective Fincher agreed that the Defendant's jail telephone calls were monitored, including calls to the Defendant's grandmother and C.P. in which the Defendant explained what happened to the victim. He agreed the telephone calls were recorded. Detective Fincher agreed his written statement that he had recounted the Defendant's having "stated that he shot his father by accident."

C.P. testified that she was a nursing student at Tennessee Technology Center but that she previously attended UTC after graduating from high school. She agreed that she was the Defendant's girlfriend beginning in January or February of their senior year. She said they had spent time together with a group of mutual friends before they became involved romantically. She said they talked daily and sent frequent text messages. She said she ate at a restaurant with the Defendant and the victim and that they were different from her family because they ate in silence. She agreed the victim made fun of the Defendant during the dinner for being pale and that the victim "took it," was quiet, and kept his head down. She never suspected the Defendant suffered abuse at home. She said that the Defendant had injuries that were consistent with wrestling and that the Defendant wrestled in middle school and high school. She could not recall if the Defendant was a member of the wrestling team his senior year. She said the victim

blamed and accused the Defendant of things the Defendant did not do. Regarding the case of beer the victim found, she said she told the Defendant to tell the truth and blame it on her but that the Defendant would not because he did not want the victim to be mad at her. She agreed that the victim thought she and the Defendant had been drinking at a movie theater but said they had not.

C.P. testified that she was employed in March 2010 as a lifeguard at the YMCA. She said the Defendant had been a good boyfriend. She said he visited her at work and brought her dinner and drinks. She said the Defendant had a Jeep and had other vehicles previously. She was unaware of the Defendant's having to work to pay for the Jeep and did not know who paid for it. She agreed the Defendant worked for the victim on a farm.

C.P. testified that on March 24, 2010, she saw the Defendant between classes, at lunch, and after school. She did not sense anything unusual. She said that the Defendant took her home after school to change clothes and that they went to track practice. She said that before practice, the Defendant and another student backed into each other in a parking lot, causing minimal damage. She said that the Defendant was upset because he had been in wrecks previously and that they were in a hurry because they would have to run extra for being late to practice. She said that the baseball team saw the accident and that they yelled and made fun of them. She said she left practice before the Defendant because she had to be at work at 4:00 p.m.

C.P. testified that she worked in the YMCA "child watch" area that day and that she and the Defendant exchanged text messages while she worked. Regarding a text message she received from the Defendant at 6:38 p.m., she said she assumed "he is fixing mine" referred to the Defendant driving the victim's Jeep. She agreed the collision that occurred earlier had not affected the driveability of the Defendant's Jeep.

C.P. testified that the victim was very strict with the Defendant. She said the Defendant was not permitted to drive in snow and had to do the laundry at home and keep the house clean.

C.P. testified that after she began dating the Defendant, she toured UTC with her parents and the Defendant. She said she decided she wanted to attend college there. She said her parents got along with the Defendant and were supportive of her relationship with him. She was unsure if the Defendant had decided fully that he wanted to attend UTC but said the Defendant and Storm Wilson discussed being roommates at UTC.

C.P. testified that the Defendant enjoyed working out. She did not know whether he used "muscle builders" or nutritional supplements.

C.P. testified that in addition to communicating via text messages, she and the Defendant spoke by telephone on March 24, 2010. She said that after the Defendant called her and said he did not know where the victim was, she had her father, a surgeon, call the emergency room to see if the victim was a patient.

C.P. testified that later in the evening of March 24, 2010, she went to the victim and the Defendant's home and that the Defendant was crying hysterically and dry-heaving. She agreed she and her father took the Defendant to his grandmother's house and that he cried and gripped her hand on the way.

C.P. agreed that the Defendant told her the victim changed a lot after the Defendant's mother died. C.P. agreed the Defendant told her the victim blamed the Defendant for the Defendant's mother's death.

C.P. agreed that after the Defendant was in jail, they talked. She agreed he told her that he did not understand what happened, that it had been an accident, and that the victim abused and hit the Defendant. She agreed she had asked the Defendant why he had not told her sooner. She agreed the Defendant said it was humiliating. She acknowledged the Defendant had told her the victim "smacked the s--- out of" the Defendant before the victim went to bed, that the Defendant said he had never shot a gun and thought the victim's gun had a safety, and that the Defendant said he had gone to the victim's bedroom to confront the victim. She acknowledged the Defendant told her that the victim had been snoring, that the victim stopped snoring, that the Defendant thought the victim knew the Defendant was there, that the victim snored, and that the gun went off. She agreed the Defendant said he had ruined his life and had hurt her and everyone else. She agreed that she asked the Defendant why he had hidden what was happening at home, he had said he did not know what to do and was scared. She agreed the Defendant professed he had not meant to shoot the victim.

C.P. agreed she gave a statement to the police a few days after the victim's death. She acknowledged her memory would have been better at that time but said some things did not "stick out" in her memory until later.

TBI Special Agent Forensic Scientist Steve Scott was accepted without objection as an expert. Agent Scott said he had testified previously as an expert in the areas of firearms identification, "fracture match for specific cases or in headlamp analysis," crime scene processing, and muzzle-to-garment distance processing.

Agent Scott testified that relative to this case, he examined a handgun, cartridge case, ammunition, and a magazine identified as having come from a pond. He also examined items identified as having come from the victim's house: a bullet from a

pillow, a pistol from the master bedroom, and magazines and cartridges from a different bedroom.

Relative to the handgun recovered from the pond, Agent Scott testified that he received the weapon packaged in water from the pond. He said the weapon was tied with plastic zip-tie cables to a brick. He said that because a weapon will rust once it is removed from water, he had advised the police that the item should be submitted in water from the pond in which it had been found and that he received the weapon in water. He identified a fired cartridge case that had been "stovepiped in the action of the pistol." He identified unfired cartridges that were removed from the magazine.

Agent Scott testified that when a handgun of the same type as the one recovered from the pond was fired, if the slide did not move far enough to the rear, the cartridge case of the fired bullet could become trapped in the action, often sticking straight up from the ejection port. He said this was referred to as a stovepipe. He said a stovepipe might occur if the shooter did not grip the gun firmly, the shooter held the gun in a way that did not provide a firm platform for the slide to move to the rear, if the shooter's thumb was against the slide, or if the slide came into contact with the shooter's clothing.

Agent Scott testified that he determined the stovepipe round had been fired from the handgun recovered from the pond. He said he could not determine if the fired bullet recovered from the pillow had been fired from the handgun recovered from the pond. He said it was often difficult to match fired ammunition with Glock weapons such as the one recovered from the pond due to the rifling of this type of weapon.

Agent Scott testified that he did not find anything wrong functionally with the handgun that would cause a stovepipe. He said his examination did not reveal anything wrong with the handgun that would cause it to discharge on its own. He said the gun had three safeties, all of which were working properly. He said the three safeties were defeated by the pull of the trigger. He demonstrated the trigger safety to the jury and said the safety's lever had to be pressed into the face of the trigger in order to fire the gun. He said the two remaining safeties consisted of the firing pin block and a "drop safety." He said that all three safeties worked properly when he fired the gun eleven times and that he did not have a stovepipe or other difficulty when he fired the gun. He said that in his opinion, the gun was functioning properly and that he could not determine the intent of a shooter.

Agent Scott testified that he tested the handgun recovered from the pond to determine the amount of force required to pull the trigger, which he said was eight and three-fourths pounds. He said that Glock pistols with a "New York" trigger had a definitive stopping point once a trigger was pressed and that beyond this point, additional

pressure caused the gun to fire. He said the New York trigger was not necessarily harder to fire but removed a stop in the middle, creating a smoother trigger pull. He said, however, the handgun from the pond did not have a New York trigger. He said that although no good definition for a "hair trigger" existed, he had used the term to refer to a trigger pull force of one to one and one-half pounds. He said the handgun from the pond did not have a hair trigger. He said the trigger pull on Glock pistols would feel the same without regard to whether the gun was loaded with ammunition.

Agent Scott testified that he examined the comforter from the victim's bed. He said that published studies showed that a pistol such as the one recovered from the pond would leave gunshot residue on target material from a distance of approximately four feet or less. He said he found "a very few stray gunpowder particles" on the comforter but that the number was too minimal to allow him to form an informed opinion about how they were deposited. At defense counsel's request, Agent Scott read a portion of his report for the jury. The report stated that no gunpowder residues were found with respect to one hole in the comforter, which precluded further "muzzle to garment testing," and that "lead residues consistent with the passage of a bullet" were present with respect to a second hole. Agent Scott agreed that he was unable to determine, due to the miniscule amount of gunpowder residue present, whether the weapon had been fired from within or beyond four feet. He said he was unable to form an opinion about the distance from which the shot was fired. He agreed that if the shot had been fired within four feet, a sufficient pattern of gunshot residue "could" exist for him to conclude that the shot had been from within four feet. He had no opinion of the distance beyond four feet from which the weapon had been fired. He agreed it was possible the particles could have been transferred onto the comforter due to the way the comforter had been packaged. He agreed the comforter was submitted to the TBI Laboratory on April 1, 2010 but that testing did not begin until February 2011.

Agent Scott testified that gunshot residue testing would reveal more residues for shots fired from a closer distance. With respect to lead residues, he said the residues dissipated and would no longer be deposited on target material after a distance of eighteen to twenty-four inches. With respect to gunpowder residues, he said they were detected up to a distance of about four feet. He said his testing included three tests which developed a pattern of gunpower residues and one which developed a pattern of lead residues.

Agent Scott testified that he had attended the deposition of Dr. Bryce Anderson relative to the Glock pistol recovered from the pond. Agent Scott said that he had been a TBI assistant firearms instructor and that he was familiar with the training for a Glock pistol. He demonstrated the proper technique for holding a Glock pistol and said he learned the technique in his TBI training. He agreed that improper holding technique,

which he referred to as "limp wristing," was a cause of stovepiping. He agreed that he had been trained to keep his finger outside of the trigger guard because if the weapon were loaded, it would be ready to fire. He agreed that police officers were trained to keep their Glock pistols cocked, loaded, and ready to fire. He agreed that TBI agent training included having a cartridge loaded in the agent's gun chambers and to have a full magazine inserted. He agreed that having a bullet in the chamber ready to fire was what he would have expected for a law enforcement officer's gun.

Agent Scott testified that an unintended discharge of a firearm occurred when an individual pulled the trigger and the gun functioned as it was intended, yet the person had not intended to discharge the firearm. He said that twice he had caused an unintended discharge of a firearm. He agreed that a sympathetic reflex involved an involuntary reaction such as when a person was startled. He agreed that if a person had the person's hand on the trigger of a Glock pistol and had already begun to take up slack almost to the point of firing, it would be possible for the pistol to fire when the hand squeezed in a sympathetic reflex. He agreed this could be categorized as an unintended discharge. He agreed that he was aware of cases involving police officers and unintended discharges. He agreed that a stovepipe might occur if a person did not hold a Glock pistol properly without regard to whether the person intended to pull the trigger.

Using three handguns provided by the defense, Agent Scott demonstrated their operation. All of these weapons had external safety mechanisms, unlike the Glock pistol recovered from the pond.

Rebecca Self, the victim's sister, testified that the Defendant was the victim's only child and her mother's only grandchild. She said that her father was deceased but that her mother was still alive. She said the victim came to the family farm as often as he could to help. She said the Defendant did some work on the farm but had not done a significant amount because prior to her death, the Defendant's mother had been afraid that the Defendant would get hurt by the machinery. She said the Defendant was allowed to pick calves to raise and received money from his grandparents when they sold the livestock. She said that when the Defendant was young, he had stayed with his maternal grandmother on weeknights and that his paternal grandmother picked him up from school on Fridays in order for him to stay at the farm on the weekend.

Ms. Self testified that she saw the Defendant almost every weekend. She said that he spent time at her house and that they shopped and did things together. She said he played football in middle school, was on the wrestling team in middle and high schools, and was on the track team. She said he had bruises which resolved after wrestling season. She never saw him with any injuries that alarmed her.

Ms. Self testified that on the day of the victim's death, she was notified by a manager at her workplace that her brother had been shot. She said that her Uncle Jim and Aunt Shirley came to her workplace and that they looked for the Defendant at his grandmothers' houses, although he had already gone to the sheriff's office. She was concerned about the Defendant because he had lost both parents.

Ms. Self testified that she did not see the Defendant until 2:00 a.m. the following morning. She said that the Defendant wanted to stay with his maternal grandmother rather than going to her house, that she took him to his grandmother's house, and that he was "real quiet." She said the Defendant called around 10:00 or 11:00 a.m. and stated that the police wanted him to go to the victim's house. She said she and her parents picked up the Defendant and took him to the victim's house. The Defendant's maternal grandmother and maternal aunt also went to the victim's house. She said the family waited outside while Detective Fincher took the Defendant through the house. She said that the Defendant brought out a cat for his maternal grandmother to take to her house, that he fed a dog, and that Detective Fincher allowed the Defendant to retrieve some clothing.

Ms. Self testified that the Defendant stated the house was "really messed up" but that he did not specify if the Defendant meant the house had been messed up by the TBI or burglars. She said the Defendant stated that he did not want the house and that he guessed they could title his Jeep in his name.

Ms. Self testified that as an only child and only paternal grandchild, the Defendant "pretty much got what he wanted[.]" She said that after the Defendant's mother died, the victim asked her to take the Defendant shopping for school, that the victim told her to buy whatever the Defendant wanted, that the victim reimbursed her, and that the clothing bill each of the two or three times was $400 to $500. She said the Defendant was not employed. She agreed the Defendant helped with household chores. When asked if the victim said anything untoward or alarming to the Defendant in her presence, she said, "not really." She thought the victim had been a good father.

Ms. Self testified that she did not like the victim's dating after the Defendant's mother's death. She thought the victim should have spent more time with the Defendant. She said, though, that the Defendant was not upset and did not understand her displeasure.

Ms. Self testified that on the day of the victim's memorial service, which was three or four days after the victim's death, the Defendant called her from jail. She said that she was aware of the abuse allegations the Defendant made about the victim and that she asked him in the telephone conversation on the day of the memorial service why he

had not told someone about the alleged abuse. She said the Defendant had not answered her. She said the Defendant could have stayed with her if necessary.

Ms. Self agreed that the Defendant and the victim discussed the Defendant's desire to go to UTC but did not recall the victim's objecting to the Defendant being Storm Wilson's roommate. She recalled the victim's thinking beer he found in the Defendant's Jeep belonged to Mr. Wilson but did not recall any discussion of the Defendant and Mr. Wilson living together at UTC. She thought C.P. planned to go to UTC, as well. She agreed that other than a ticket for running a red light, the Defendant had not had any legal problems.

Abraham Brietstein, Ph.D., an expert in psychology, testified for the defense that he examined the Defendant at the State's request on July 5, 2013, about a month before the trial. His examination included taking the Defendant's personal history. He said the Defendant provided a detailed history of the victim's physical and emotional abuse of the Defendant and the Defendant's mother. Dr. Brietstein read from his report, which stated that the Defendant's account was believable despite the fact that no one close to the victim was aware of any abuse because it was not uncommon for abuse of this nature to be unknown to anyone outside the immediate family. Dr. Brietstein stated in the report that the detailed history of abuse was consistent with the type of abuse perpetrated by someone who presents a different image in public than at home. Dr. Brietstein also stated in the report that the escalation of the abuse the Defendant reported as having occurred after the Defendant's mother's death was consistent with the likelihood that the Defendant's mother had been a buffer between the victim and the Defendant. Dr. Brietstein's report noted that the Defendant reported escalating abuse before the victim's death, resulting in the Defendant's desire to stand up to the victim and show the victim who was the bigger man. The report stated, "Thus, Ethan, being a victim of abuse, felt as if he had had enough, took matters into his own hands and decided to confront his father with the gun, the outcome being all but inevitable." When asked on cross-examination to explain his statement that the outcome had been all but inevitable, Dr. Brietstein responded, "Well, what I mean is what I go on to say and explain is that I do not believe this to have been an accident." Upon defense objection, the trial court struck the response from the evidence and instructed the jury to disregard it.

A video recording of Dr. Brietstein's interview of the Defendant was played for the jury.[4] In the recording, the Defendant recounted that on the day before the victim's

---

[4] The trial court instructed the jury that the Defendant's statements in the recorded interview were not substantive evidence and should be considered for the limited purposes of evaluating (1) the effect, if any, of the Defendant's statements had upon Dr. Brietstein's expert opinions and (2) the Defendant's

death, the Defendant told the victim that the Defendant was going to live with the Defendant's maternal grandmother, that the victim became angry and kneed the Defendant in the groin, that the victim later woke the Defendant and smothered him with a towel the Defendant had used without permission, and that the victim eventually stopped the assault.

In the recorded interview with Dr. Brietstein, the Defendant said that on the morning of the victim's death, the Defendant asked the victim for money to buy breakfast. The Defendant recalled that the victim called the Defendant lazy and threw $10 on the floor. The Defendant said in the interview that he had been unable to participate fully in track practice because his testicle was swollen and sore from the victim's assault the previous day. The Defendant recalled that he was scared to tell the victim about a minor wreck in which his and another student's bumpers collided and that he knew the victim would find out from the police officer assigned to the school if the Defendant did not tell him that day. The Defendant stated in the interview that after he went home, he failed to wake the victim at the appropriate time and that the victim grabbed the Defendant's head and slammed it into a recliner. The Defendant said that the victim went back to bed and that the Defendant decided to tell the victim he was unhappy with the way the victim treated him. The Defendant said in the interview that he was scared, that he got the victim's gun, and that he never meant to hurt the victim. The Defendant stated that after he opened the victim's bedroom door, the victim's irregular snoring startled the Defendant and caused the gun to fire, and that the shooting had been an accident. The Defendant stated that he turned on the light to check on the victim and saw that the victim appeared dead. The Defendant said in the interview that he did not know how to handle the loss of his father, whom he loved despite the abuse, that he was scared and did not think anyone would believe him, and that he panicked and staged the house to look like a break-in had occurred. The Defendant stated that he went to his maternal grandmother's house for about fifteen minutes before going to a park and throwing the gun into a small pond. He said that he took zip ties from his and the victim's house and that he used them to attach the gun to a brick.

Dr. Brietstein testified that it was important to receive truthful information from a person he evaluated. He agreed that a person charged with first degree murder might have a motivation to tell him things that were untrue. He said he typically did collateral interviews or reviewed records in conducting court-related evaluations. He agreed that he did not have any evidence to corroborate the Defendant's abuse claim and that he nevertheless found it believable. He said that in his opinion, the Defendant's claim was truthful but acknowledged he could not say definitively it was true.

demeanor.

Paul Kelley, M.D., an expert in psychiatry, testified that at defense counsel's request, he evaluated the Defendant on December 3, 2010. His evaluation consisted of a three-hour interview and reviewing the psychological testing performed by Dr. Eric Engum.

Dr. Kelley testified that the Defendant stated he felt safer in jail than he had at home because the Defendant did not have to worry about the victim hitting him or screaming at him. Dr. Kelley said the Defendant admitted struggling with anxiety, guilt, sadness, and remorse since the Defendant's mother's death and later, his father's death. Dr. Kelley said the Defendant spoke tearfully of the Defendant's mother, whom the Defendant said he missed daily. Dr. Kelley said the Defendant described his mother as his shield and protector. Dr. Kelley said the Defendant described the constant threat of inmate violation and predation in jail, yet the Defendant said he felt safer in jail than he had at home with the victim. The Defendant said that he had made friends in jail who cheered him up, supported him, and liked him. Dr. Kelley said the Defendant mentioned nightmares of being chased by monsters and criminals and nightmares about his father rising from death and trying to harm the Defendant. Dr. Kelley acknowledged that the report of another mental health professional, Dr. Eric Engum, who met with the Defendant three times, stated that the Defendant denied insomnia and that the Defendant reported normal dream activity without traumatic activity.

Dr. Kelley testified that the Defendant stated his mother had tried to protect the Defendant from the victim. Dr. Kelley said the Defendant stated he had been told by his mother never to make the victim mad. The Defendant related to Dr. Kelley that he woke several times to hear his parents fighting. The Defendant told Dr. Kelley he had seen the victim smack the Defendant's mother "sometimes." Dr. Kelley said the Defendant recounted hearing the victim say repeatedly that he would do as he wanted because he was the ruler of the household and "the king of the castle." Dr. Kelley said the Defendant described an incident in which the Defendant heard a sound like a slap that made him think the victim was hurting the Defendant's mother. The Defendant told Dr. Kelley that he investigated but was sent to his room by his mother, who came to his room a few minutes later and said, "[L]et's go right now." The Defendant told Dr. Kelley that he had been terrified and that they drove away from the house with the victim trying to open the car door. The Defendant described an incident in which the victim hit the Defendant in the face and broke the Defendant's nose but would not allow medical treatment. The Defendant said that in another incident, he made a gesture behind the victim's back after the victim yelled at him, but the victim saw a reflection and broke the Defendant's finger. The Defendant said that the victim would not allow him to seek medical treatment and that the Defendant told his friends he had a wrestling injury. The Defendant also recounted an incident in eighth grade in which the Defendant popped his toes, which

annoyed the victim. The Defendant told Dr. Kelley the victim stomped the Defendant's foot while the victim wore police boots, which broke the Defendant's big toe. The Defendant said he eventually received medical treatment after developing an infection, at which point the Defendant's mother took him to a hospital. The situation was beyond the capability of a Greeneville hospital, and the Defendant was hospitalized for several days in Knoxville. Dr. Kelley said the Defendant described his family life as being a continual and sometimes desperate struggle to avoid being beaten, terrorized, and humiliated. Dr. Kelley said this description was significant because it was typical of children abused within their families.

Dr. Kelley testified that the Defendant said he tried to make the victim proud of him by participating the same things the victim had done, such as football and wrestling. The Defendant described the victim as being a "man's man." The Defendant told Dr. Kelley that the victim had come to four to six of the Defendant's matches and that the Defendant had participated in over 100 matches. Dr. Kelley said the Defendant stated that when the Defendant lost wrestling matches, the victim held down the Defendant, got on top of him, struck him, and told him he was pathetic and a loser. Dr. Kelley said the Defendant described occasional affection from the victim. Dr. Kelley said that witness accounts of the victim's expressing love at the end of conversations with the Defendant could be explained by the difference in the public and private images presented by an abusive family member in cases of child abuse. Dr. Kelley said the Defendant reported that the victim expressed his love for the Defendant only if another person were present. The Defendant told Dr. Kelley that most of the time, the victim treated the Defendant with disdain and as if the Defendant were a nuisance. Dr. Kelley said that the Defendant stated he "wanted a dad" and that the Defendant was overcome with emotion.

Dr. Kelley testified that in his opinion, the Defendant's mother's death had a profound impact on the Defendant. Dr. Kelley said that the Defendant lost his protector and confidante and that the Defendant was vulnerable to the victim's temper and mistreatment. Dr. Kelley said the Defendant related that the victim had not arranged counseling for the Defendant after the Defendant's mother's death, even after the Defendant's grandmother asked the victim to send the Defendant to counseling to help the Defendant deal with the loss. The Defendant told Dr. Kelley that the victim did not "believe in" counseling and that the victim thought a man should not cry or complain. Dr. Kelley said that in his professional opinion, the failure to provide the Defendant with counseling was significant. Dr. Kelley said that counseling would provide a child in a situation such as the Defendant's with the means to work through his grief in a healthy way and to move beyond it. Dr. Kelley said the Defendant related that the victim both criticized him for not appearing to miss the Defendant's mother and ridiculed him as not being "manly" when he cried or tried to talk about his mother's death. Dr. Kelley said

the Defendant described a period of depression after the death. The Defendant related that he felt like his life was over after his mother died.

Dr. Kelley testified that the Defendant stated the abuse escalated after the Defendant's mother's death. The Defendant told Dr. Kelley that the victim hit the Defendant at least weekly and that the Defendant had black eyes or bruises he explained as being from falls or wrestling.

Dr. Kelley testified that the Defendant said he made a decision on March 23, 2010, that he had to move out of the victim's house and that he was going to live with his grandmother. Dr. Kelley said the Defendant stated he told the victim, who laughed and said something like, "[Y]ou think you can do this to me." The Defendant said the victim grabbed the Defendant's shoulders and kneed him in the groin, causing the Defendant to drop to the ground. The Defendant said the victim called the Defendant a profane name and told him to go to his room. The Defendant told Dr. Kelley that the victim stated, "You aren't leaving so get over it." The Defendant told Dr. Kelley he eventually fell asleep but woke around 10:30 p.m. and showered. The Defendant used a "forbidden towel" he knew he was not supposed to use, and he hid it afterward. According to the Defendant's account to Dr. Kelley, around 3:00 a.m. the victim woke him by yelling about the Defendant's disposing of a forbidden towel. The Defendant said that the victim began smothering him with the towel, that the Defendant was desperate and unable to breathe, that the victim called him a "worthless piece of s---," and that the victim eventually stopped. The Defendant told Dr. Kelley he had been fearful and unable to sleep the rest of the night.

Dr. Kelley testified that the Defendant said he asked for money for food on the morning of March 24, 2010, and that the victim said something derogatory and threw $10 on the floor. Dr. Kelley said the Defendant described the victim as "ranting" about the Defendant's not having a job and the victim's being the sole provider. The Defendant told Dr. Kelley he had been unable to complete track practice that afternoon due to residual groin pain.

Dr. Kelley testified that the Defendant said that when he went home on the afternoon of March 24, 2010, the victim told him to wake the victim in about an hour. The Defendant watched cartoons and was a few minutes late to wake the victim. The Defendant told Dr. Kelley that the victim stormed into the room, called him worthless and an idiot, banged the Defendant's head on the back of a recliner, said he was going back to bed, and instructed the Defendant to wake him in twenty minutes. The Defendant told Dr. Kelley that he realized he had to get out and that he decided to tell the victim he was leaving and would not be hit by the victim again. The Defendant told Dr. Kelley he knew the likely response and thought his only hope was to have a weapon for protection.

The Defendant told Dr. Kelley he took the victim's police weapon and went to the victim's bedroom. The Defendant told Dr. Kelley that the room was dark and that the Defendant could not really see the victim. The Defendant said the victim had sleep apnea and snored loudly. The Defendant told Dr. Kelley that he was scared, that he felt dizzy or "in a fog," that he thought the victim stopped breathing, that the victim snorted or made a sound, that this terrified the Defendant, that the Defendant thought he saw the bedcovers move, that the Defendant had a "flash" and thought the victim was about to "come at" him, and that the gun went off.

Dr. Kelley testified that the Defendant said he did not know what to do after the gun went off. The Defendant told Dr. Kelley that he turned on the light and saw the victim had what appeared to be a mortal wound to the back of the head. Dr. Kelley said the Defendant had difficulty putting into words what had happened. Dr. Kelley thought the Defendant had said the Defendant turned off the light because he could not stand to see the victim in this state and that the Defendant felt nauseated. Dr. Kelley said the Defendant stated that he had been terrified, that he thought no one would believe him if he said what actually happened, and that he decided to make the home appear as if a break-in had occurred. Dr. Kelley said the Defendant stated the shooting had been an accident.

Dr. Kelley testified that post-traumatic stress disorder (PTSD) was "a way to organize the chaos of what happens when somebody has undergone an incredibly traumatic experience." He said that in his opinion, the Defendant was abused as a child and developed PTSD as a result. He said PTSD was characterized by a severe trauma, avoidance of circumstances that remind the person of the trauma, an exaggerated startle response, and "intrusive recollections" of the trauma. In Dr. Kelley's opinion, all of these characteristics were present in the Defendant. Dr. Kelley did not think the Defendant's PTSD was a result of shooting the victim and being charged criminally but said the PTSD "very possibly" might have worsened as a result of the events of the shooting. He acknowledged that shooting one's father could be a sufficient stressor to cause PTSD.

Relative to the bedroom shooting scenario the Defendant described, Dr. Kelley testified that a person with PTSD going into a confrontation with the abuser would be scared and in a state of "hyper arousal." He said a person with PTSD in this situation would have an exaggerated startle response and would not be in a "normal state of mind." Dr. Kelley said that in his opinion, the Defendant was incapable of rationalizing what he was doing. He said a person with PTSD in such a situation would be unable to think, would act on instinct, and would be in a dream-like state. He said the Defendant's account of being startled and the gun going off had a "ring of genuineness" based upon Dr. Kelley's experience in talking with PTSD patients. He thought the change in what

the Defendant heard relative to the victim's breathing had caused the Defendant's exaggerated startle response.

Dr. Kelley testified that one of his psychiatric specialties was in detecting malingering, or lying about a psychiatric illness. In his opinion, the Defendant was truthful with him. Dr. Kelley noted that the Defendant's presentation was consistent with that of a child who had been abused in the manner described by the Defendant. He said the Defendant's nonverbal behavior was consistent with the Defendant's verbal statements. Dr. Kelley did not see evidence of mood swings or issues with impulse control or temper in the Defendant. Dr. Kelley said the Defendant did not appear unusually anxious or nervous.

Dr. Kelley testified that children the age of the Defendant commonly were afraid to disclose abuse by a family member. He said it was common, in circumstances such as those described by the Defendant, for a person not to disclose long-term child abuse. Dr. Kelley said it was particularly common for a person with PTSD not to disclose child abuse. He said that many abuse victims fled the relationship but that the Defendant's fear of retaliation or losing the relationship with the victim probably rendered the Defendant unable to flee. Dr. Kelley said PTSD impacted a person's ability to think through problems and choose reasonable solutions. In Dr. Kelley's opinion, the Defendant's PTSD-related fear prevented the Defendant from fleeing, which Dr. Kelley said was supported by psychiatric literature. In Dr. Kelley's opinion, the Defendant's PTSD would have affected the Defendant's post-shooting conduct in attempting to make it appear as if a break-in had occurred. Dr. Kelley said that a person with PTSD received inaccurate messages from the brain and that a person with PTSD reacted differently than a person who did not have PTSD. In Dr. Kelley's opinion, the Defendant's going into the victim's bedroom with a gun was due to PTSD. Dr. Kelley said that a person with PTSD due to long-term abuse might be capable of having intent for an action but that the person's nervous system would create a different emotional response and reaction. He agreed that the fear could overtake and supplant any intent and said that a person with PTSD might act due to a nervous system response without the response having gone through the "thinking brain." Dr. Kelley said that in his opinion, the Defendant's account of the events of the shooting were consistent with the psychiatric profession's understanding of PTSD and with the startle response having caused the gun to misfire.

Dr. Kelley acknowledged he had not seen text messages sent between the Defendant and C.P. on the March 24, 2010. He acknowledged that he had not reviewed witness statements relative to the Defendant's death or interviewed teachers, friends, or family members and that he had not reviewed the Defendant's jail telephone calls. He was unaware of a for sale sign for the Jeep that was in the victim's house. Dr. Kelley said he had reviewed the recording and the transcript of the interview Dr. Brietstein

conducted of the Defendant in recent weeks but that the information had not been a factor in his report.

Bryce Anderson, Ph.D., testified through a video deposition which was played for the jury. In the deposition, the defense offered Dr. Anderson as a firearms expert, although the defense did not obtain a ruling at the trial regarding Dr. Anderson's qualifications. We note that Dr. Anderson stated in his deposition that he had never previously testified as a firearms or ballistics expert. The State did not object at the trial to Dr. Anderson's qualifications as an expert.

Dr. Anderson testified that he examined the Glock weapon in this case and that he reviewed photographs and documents relevant to the case. Using a Glock G22, .40-caliber pistol that he said was a former law enforcement weapon similar to the gun used in this case, he demonstrated the gun's operation. He said that Glocks did not have external safety mechanisms and that they had three internal safety mechanisms. He said that if a round were in the chamber of a Glock and the trigger were pulled, the gun would fire. He said no button or lever had to be manipulated to make a Glock fire. He said that with a weapon of this nature, a person experienced with firearms could tell whether a round was in the chamber by recognizing an extractor pushed out a few one-thousands of an inch. He said training was critical with Glock weapons.

Dr. Anderson testified that the main causes of accidental discharge of a weapon were carelessness and ignorance. He said that firearms training included the principle of keeping one's finger off the trigger until the person was ready to fire. He said that a potential for accidental discharge existed if an untrained person handled a weapon with the person's finger on the trigger. He said an accidental discharge might also result from something causing a person's grip to tighten and finger to pull in while holding a gun. He said research had shown that sympathetic movement could result in various ways. First, if one side of the body moved, the corresponding body part on the other side might also move. Second, sympathetic movement could result from loss of balance. Third, it could result from a startle reflex, which he said was typically from auditory stimulation.

Dr. Anderson testified that typical adult male hand grip strength was 125 pounds and that for the index finger, the median value was around fifty-six pounds. He said research showed that with involuntary actions, the "pull" strength could be 25% of these figures, which he said was twelve to fourteen pounds.

Regarding the gun he examined in this case, Dr. Anderson testified that it functioned correctly but that it failed the recoil spring test. His testing showed the trigger pull on this gun was in the range of about eight to nine pounds. He said the Glock standards for this weapon specified that the distance the trigger was required to be pulled

-34-

before the gun discharged was one-half inch.  He said that with this type of weapon, the magazine was not readily visible when it was loaded into the grip.

Regarding the stovepipe found in the gun in this case, Dr. Anderson testified that the causes of stovepiping included mechanical failure and limp-wristing, which he said was failing to hold the gun without locking the wrist and being unprepared for the recoil. He said Glocks were reliable weapons and that the cause of a stovepipe was usually firing by an inexperienced shooter.  He said his examination was inconclusive regarding whether the stovepipe in the weapon in this case occurred from incorrect handling by the shooter.  He said Glocks could also stovepipe in the presence of a weak recoil spring.  He said that a weak recoil spring was not obvious and that a Glock with a weak recoil spring could be operated without malfunction by an experienced shooter.  He said that the gun he examined was dirty with evident corrosion on the slide, slide lock, trigger safety pin, trigger pin, and other parts and that it was in poor condition.  He acknowledged he did not know the condition in which the Glock had been delivered to the TBI.  He agreed that despite its condition, the weapon worked properly when he fired it forty-seven times. When asked to identify the best evidence of the claim of accidental shooting in this case, he said it was the stovepipe malfunction.

Gary Schaffer, a retired Knoxville Police Department officer, testified as an expert witness in training for the use of Glock weapons.  He said that keeping one's finger out of the trigger area until the sights are aligned and the person determined he or she wanted to shoot the target was the only method specified in training to prevent unintentional firing. He said the operator was the only person who could prevent an accidental misfire of a gun without an external safety.  He said police officers were trained to keep the trigger finger extended along the slide above the trigger guard.

Mr. Schaffer described the methods for holding a firearm that were part of law enforcement training.  He demonstrated the proper holding technique.  He said that the weapon involved in this case could be fired through repeated trigger pulls as quickly as three to four times per second.  He said the weapon in this case would shoot where it was pointed.

Mr. Schaffer testified that a Glock in the hands of someone untrained was a "disaster" and involved the "potential loss of human life every time."  He agreed that Glock handguns were point-and-shoot weapons.  In Mr. Schaffer's opinion, Glock weapons were inferior to Sig Sauer weapons for police use.  He said police departments often chose Glocks because they were less expensive.

V.Q.[5] testified that she dated the Defendant from the end of her sophomore year until her senior year. She described the Defendant as respectful, decent, helpful, and peaceful. She said that she met the victim about a year into her relationship with the Defendant. She said the victim was arrogant, not talkative, and did not care about another person's life unless the person affected the victim's life. She said that during telephone conversations she had with the Defendant, she often heard the victim yell and scream at the Defendant and that the Defendant sometimes ended the calls abruptly. She said that she had visited the victim's house and that the victim was particular about cleanliness. She thought the victim had to "nitpick" the Defendant in order to deal with the victim's anger and said that every time she was around the Defendant and the victim, the victim found fault with the Defendant. She said the victim and the Defendant did not have a normal parent-child relationship.

V.Q. testified that the Defendant helped his grandparents at the family farm without pay. She said that she tried to get the victim's approval, that she gave him a hug on one occasion, and that the victim had tensed when she hugged him. She said that the Defendant was required to have the victim's uniform and coffee ready before the victim went to work and that the victim was particular about the details. She said that when the victim came to her parents' house for photographs before the prom, he did not talk to her parents and appeared not to want to be there.

V.Q. testified that the Defendant appeared ashamed of the victim's verbal abuse. She said that the Defendant cried about the victim but that the Defendant told her the victim did not hit him. She said she had related the Defendant's bruises to wrestling. When asked if, in her opinion, the victim had a reputation for violence, she responded affirmatively. When asked if, in her opinion, the Defendant had a reputation for peacefulness, she said he did. She acknowledged she never saw the victim abuse the Defendant physically. She said that although she saw the victim "yell" at the Defendant, she never witnessed a full argument. She said that although she witnessed the Defendant tell the victim that the Defendant loved the victim, she never witnessed the victim's expressing love for the Defendant.

Beth Amis, the Defendant's maternal aunt, testified that the victim and the Defendant's mother had always had a rocky relationship, even before they married. She said they argued frequently, even when they dated. She said the victim was controlling and rigid about how the Defendant's mother presented herself, with whom she was allowed to talk, and places where she was allowed to go. She recalled an incident when the Defendant's mother and the victim dated in which the Defendant's mother came

---

[5] It is the policy of this court to refer to minors by their initials to protect their identity.

home with a bruise under her jaw. Ms. Amis said the Defendant's mother told their parents that she fell at work. Ms. Amis said, however, that the victim had hit the Defendant's mother. Ms. Amis said the Defendant's mother did not confide in her about any abuse after this incident.

Ms. Amis testified that although the victim could be charming in short conversations, he was prejudiced against people due to race or sexual preference. She said he did not seem to like anyone and spoke poorly of his coworkers. She recalled that at the Defendant's birthday party, the victim took Ms. Amis's husband into another room and showed him pornography. She recalled that the Defendant's mother's having a hysterectomy and that the victim told the Defendant's mother in the hospital that he might as well have sex with a man because she was no longer a woman. She said that over the course of the victim and the Defendant's mother's marriage, the victim liked Ms. Amis less and that by the time of the Defendant's mother's death, the Defendant's mother only called Ms. Amis from work. Ms. Amis said that over time, the victim allowed the Defendant to visit Ms. Amis's children less and that the Defendant was not around Ms. Amis's family at all after the Defendant's mother's death.

Ms. Amis testified that the victim had a violent temper and that she had witnessed violent incidents at his home. She said the Defendant's mother did all the housework and yard work and took care of the Defendant. Ms. Amis said that the victim worked and slept in his recliner and that if the household was not in suitable order, "[T]here was h--- to pay."

Ms. Amis testified that in her opinion, the Defendant had a peaceful reputation. She said that he played vigorously with her children but that they never scuffled or caused trouble. She said the Defendant was sweet, good natured, and agreeable.

Ms. Amis testified that the Defendant had been the Defendant's mother's "life." Ms. Amis agreed the Defendant's mother was protective of the Defendant. She agreed that the Defendant's mother had been a nurse and that the Defendant's mother had taken care of the Defendant's childhood injuries.

Ms. Amis acknowledged that she had allowed one of her children to go on vacation with the victim, the Defendant, the Defendant's mother and noted that the victim's sister had also been present. Ms. Amis said that the Defendant never talked to her about his family and that she did not feel comfortable talking to him about his family. She said the Defendant told her that he thought the victim blamed the Defendant for the Defendant's mother's death and that the victim hated the Defendant because the Defendant was the last person to speak with the Defendant's mother before she died.

Kim Shelton testified that she was the Defendant's sophomore and senior English teacher. She said the Defendant was sweet, reserved, pleasant, and polite. She said he smiled often. She described him as a good student who worked hard, completed assignments, and made As and Bs. She did not recall his acting out or having problems. She agreed he seemed to be composed and level-headed. When asked about the Defendant's reputation for peacefulness, she described him as "calm."

Alice Limna testified that she and the Defendant's mother attended nursing school together and worked together for twenty years. Ms. Limna said that she and the Defendant's mother usually worked the same night shifts at Laughlin Memorial Hospital. Ms. Limna said the Defendant's mother loved him, would have done anything for him, and talked about him frequently.

Ms. Limna testified that she met the victim just before he and the Defendant's mother married and that she knew the victim over the years. She sometimes interacted with him in the hospital emergency room due to his employment as a police officer. She described the victim as a "closed[-]in person" who did not speak, was not friendly, and was short and curt when she dealt with him professionally. She said that she visited in the Selfs' house frequently until she received a message from the victim through the Defendant's mother that they were not to be friends anymore, that Ms. Limna was not to come to the house, and that the Defendant's mother was not to talk to Ms. Limna. She said that when she visited the Selfs' house, it was meticulously clean, with the carpet nap all facing the same direction and compact discs and detergents kept in alphabetical order.

Ms. Limna testified that she saw the victim and the Defendant's mother argue at the hospital. She said the victim was not violent but was very aggressive with the Defendant's mother, who did nothing to respond. When asked if, in her opinion, the victim had a violent temper, she said, "[Y]es, he had been loud and obnoxious with me on a professional level." Ms. Limna recalled an incident in which an emergency room patient used a false name and false insurance information. She said that she called the police and that the victim was the dispatcher. She said that when she related the facts to him, he responded, "[W]hat the f--- do you want me to do about it?" She said no officer came to the hospital to take a report. She said she knew the Defendant's mother was afraid of the victim. She said the hospital had a memorial service for the Defendant's mother that was separate from the family's service. She said the victim declined to come to the hospital's service.

When Ms. Limna was asked about the Defendant's reputation for peacefulness, she said she was unaware of his having social or school problems other than normal teenage behavioral issues.

-38-

Joyce Kassen, the daytime nursing supervisor at Laughlin Memorial Hospital, testified that she and the Defendant's mother had worked together for about nineteen years and that they were on opposite shifts, although sometimes their shifts overlapped. She said the Defendant's mother was the nighttime nursing supervisor. Ms. Kassen said that the Defendant was his mother's "whole world" and that the Defendant's mother loved him "more than anything."

Ms. Kassen testified that the victim had a dry personality and a temper. She said that when she and the Defendant's mother worked together, the Defendant's mother answered the phone because if the victim knew Ms. Kassen was also at work, he thought the Defendant's mother was "up to something." She recalled an occasion when the Defendant's mother called Ms. Kassen crying and asked Ms. Kassen to cover for her to give the Defendant's mother time to go home to change clothes. Ms. Kassen said the victim called the Defendant's mother repeatedly and expressed his displeasure that the Defendant's mother was wearing perfume. Ms. Kassen said the Defendant's mother was embarrassed and asked her not to tell anyone at the hospital.

When asked about the Defendant's reputation for peacefulness, Ms. Kassen testified that he was nice, polite, and quiet. She said she rarely had an opportunity to see the Defendant and the victim together.

Nicole Waddell, a registered nurse, testified that she was previously employed in the emergency department of Laughlin Memorial Hospital. The Defendant's mother had been Ms. Waddell's supervisor. Ms. Waddell met the Defendant through his mother and had seen them both at work and in public. Ms. Waddell said the Defendant was his mother's "world" and described their relationship as close and loving. Ms. Waddell was aware the Defendant's mother was prohibited by the victim from going to the emergency room.

Ms. Waddell testified that she interacted with the victim professionally because police response was sometimes needed in the emergency department. She said that if she or other emergency department personnel called for help, the victim made them feel as if they were bothering him. She described him as curt and unfriendly during these interactions. She said that other officers with whom she interacted at the hospital did not say nice things about or seem to like the victim. In Ms. Waddell's opinion, the victim had a violent temper.

Ms. Waddell testified that the victim called the hospital multiple times during a shift to speak to the Defendant's mother. Ms. Waddell said that after an unspecified hour, telephone calls were routed through the emergency department. She was aware that the victim called multiple times but was unable to reach the Defendant's mother on the

night the Defendant's mother died. Ms. Waddell said that after the victim became irate with the person who was answering the calls that night, Ms. Waddell had the call transferred to Ms. Waddell. Ms. Waddell said she saw the Defendant and the victim that night after the Defendant's mother died. She described the Defendant as lost and crying softly.

Rhonda Johnson, an emergency room reception clerk at Laughlin Memorial Hospital, testified that her job duties included answering the hospital's telephone calls after 11:00 p.m. She said that the victim called once or twice nightly and that if he did not reach the Defendant's mother, he sometimes came to the hospital. She said that if the victim came to the hospital, he walked in without speaking and went to the emergency room to see if the Defendant's mother was there. Ms. Johnson said the victim sounded aggravated if he called a second time. Ms. Johnson was aware the victim did not want the Defendant's mother in the emergency room at night, even though the Defendant's mother's supervisory duties covered the entire hospital. Ms. Johnson said she knew not to transfer the victim's calls to the emergency room. She understood that the victim thought the Defendant's mother was "hanging around with one of the EMS guys."

Ms. Johnson testified that, in her opinion, the victim had a reputation for violence. She recalled an occasion when she saw the victim arrest someone in the emergency room. She said that the arrestee was drinking beer, that he needed a place to stay, and that he was not violent. She said the Defendant's mother had called the victim to see if he would take the person to "Opportunity House." Ms. Johnson said that the victim jerked the arrestee up from a chair, that the victim turned the person around, that the victim roughly twisted the person's arms, that the victim handcuffed the person, that the victim said, "I know where you are going tonight," and that the victim took the person to jail. Ms. Johnson said hospital personnel never understood the victim's actions during the incident.

Melissa Britton testified that she worked at Laughlin Memorial Hospital and that she had worked with the Defendant's mother for about thirteen years. She described an incident in which the emergency room needed additional nursing staff. She called the Defendant's mother, who initially said she could not come to the emergency room but eventually did. Ms. Britton said the victim came to the emergency room, saw the Defendant's mother, and confronted her. Ms. Britton said the victim asked the Defendant's mother what she was doing there and accused her of only being there to "w---- around." Ms. Britton said the Defendant's mother asked the victim repeatedly not to do this at her workplace. Ms. Britton said that the victim and the Defendant's mother went down a hall and that Ms. Britton could hear the victim yelling. Ms. Britton said that as the victim's confrontation took place, emergency room personnel were busy treating patients who had come in by ambulance on backboards. Ms. Britton said that the Defendant's mother did not reappear or call to check on the emergency room staff. After

one and one-half to two hours, Ms. Britton called the Defendant's mother. Ms. Britton said that when she asked whether the Defendant's mother was okay, the Defendant's mother said only that she was okay.

Ms. Britton described another incident in which the Defendant's mother was frantic to leave work and get home before the victim. Ms. Britton said that according to the Defendant's mother, the Defendant had forgotten his wrestling gear and would be in trouble with the victim if the victim knew. Ms. Britton said that in her opinion, the victim had a violent temper.

Rev. Carolyn Isley, rector of St. James Episcopal Church, testified that the Defendant had been active at the church since she came there in 2005 and that records showed he had been involved in Sunday School and other activities before she arrived. When asked if he had a reputation as a peaceful person, he said, "Oh, yes, he's [a] marvelous kid, great kid, everybody loves him. He is helpful and cooperative and just a splendid young man."

On rebuttal, Greeneville Assistant Police Chief Craig Fillers testified he had worked on the same shift with the victim. When they worked on the same shift, Chief Fillers had been the desk sergeant, and the victim had been a patrol officer. Chief Fillers said he and the victim became good friends and spent a lot of time together. Chief Fillers said that after he was promoted in 2008, he saw the victim less frequently at work. Chief Fillers said that he had seen the Defendant visit the victim at work frequently and that they appeared to have a normal father-son relationship. Chief Fillers said that the victim was well-liked in the department, that the victim was a good officer, and that the victim was fun to be around.

Chief Fillers agreed that the desk sergeant was a critical position in the police department. He agreed that the desk sergeant dispatched officers to emergencies, which could be life-or-death situations. He acknowledged that in 2009, the victim had failed to dispatch an officer to conduct a welfare check on an individual who was later found dead and that the victim had been reprimanded. Chief Fillers said the victim had been the supervisor in charge of the shift, although he did not know if the victim had been the person who received the welfare check request. Chief Fillers said, however, this incident did not change his opinion of the victim. When asked about the victim's conduct as the desk sergeant during the telephone call Ms. Limna described making to the police department regarding a patient using a false name and false insurance information and about the emergency room confrontation with the Defendant's mother that Ms. Britton described, Chief Fillers said these incidents did not change his opinion because he had not received complaints about them and had no way to know if they occurred.

Rhonda Craft, the Greene County Juvenile Court Youth Services Officer, testified that she knew the victim professionally and as a neighbor. She recalled that shortly after she moved to the neighborhood, she saw the Defendant and the victim riding bicycles together.

Ms. Craft testified that the victim had been quiet and reserved. She was unaware of any issues involving the victim in the neighborhood. She was unaware of the victim's having any reputation for temper or anger issues and said he had a good reputation for peace and quietude.

Regarding the night of the homicide, Ms. Craft testified that she had gone to the scene after she saw an ambulance in the neighborhood. She saw the Defendant and heard him ask someone about his cat.

Greeneville Police Officer David Thacker testified that he had known the victim since Officer Thacker began work in 1997. Officer Thacker said that they had both a professional relationship and a friendship and that they had socialized together. He said he had been to the victim's home around thirty times. Officer Thacker had observed the Defendant at the home on about half of Officer Thacker's visits. Officer Thacker described the Defendant as quiet and shy.

Officer Thacker testified that when the victim bought himself something new, the victim thought he should buy the same thing for the Defendant. In his opinion, the victim had a reputation as a peaceful person. He said he did not see a change in the victim in the time he knew the victim. He acknowledged that after the Defendant's mother's death, the victim talked about dating women he met online but said he did not see "much change" when he was around the victim after the death. Officer Thacker said the victim did not tell him the victim blamed the Defendant for the death. He denied that the victim ever told him the Defendant had psychological problems after the death. He was unaware of Chuck Jeffers ever telling the victim that the Defendant needed psychological help after the death. When asked if he saw any differences in the Defendant after the death, Officer Thacker said he was not around the Defendant often after the death.

Officer Thacker said he and the victim discussed working out and machinery for working out. He was aware the victim worked out and tried to lose weight through diet and exercise but was unaware of the victim's taking any dietary supplements.

Rebecca Self was recalled and testified that when she cleaned the victim's home after his death, she found an eighteenth birthday card from the victim to the Defendant. She said the Defendant turned eighteen on January 18, 2010. The card was received as an exhibit. She identified the handwriting in the card as the victim's. The handwritten

portion of the card stated, "Ethan I am so very proud of you Love Daddy." She agreed that the distance from the floor to the top of victim's mattress was two to three feet.

The jury found the Defendant guilty of first degree premeditated murder. This appeal followed.

# I

## MOTION TO SUPPRESS

The Defendant contends that the trial court erred in denying his motion to suppress his statement during a custodial interrogation that he shot his father. He also contends that the interrogation continued after he invoked his right to counsel. The State contends that the Defendant was not in custody and that, alternatively, he initiated further conversation with the police after mentioning counsel. We conclude that the court properly denied the motion to suppress.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

At the hearing, the evidence showed that TBI Agent Shannon Morton and Greene County Sheriff's Detective Jeff Morgan interviewed the Defendant at the sheriff's office on the afternoon of April 25, 2010, the day after the victim's death. Earlier on April 25, during a walk-though at the crime scene, Detective Mike Fincher asked the Defendant to come to the sheriff's office later to review the Defendant's previous statement. A family member drove the Defendant to the sheriff's office.

The evidence at the hearing showed that the Greene County Sheriff's office was inside a multi-use facility that contained both law enforcement offices and the Greene County Jail. Detective Fincher testified that the door to the office area where the Defendant was interviewed on April 25 was locked. He said, however, that a person who wished to leave the office area could push a marked exit button to open the door from the

inside. He said that this door was in the lobby on the first floor and that the Defendant was initially interviewed on the third floor but was later moved to the second floor for a polygraph examination. Detective Fincher said that other than the door of the "main jail," all doors within the sheriff's office were secure from the outside but were marked inside with exit signs and were not locked from the inside.

When the Defendant arrived, Detective Fincher walked him to the room where he was questioned, which was on the third floor of the office area. The Defendant signed a waiver of his *Miranda* rights at 1:29 p.m., and Agent Morton and Detective Morgan reviewed the Defendant's previous statement with him. Agent Morton testified that, for the most part during the interview, the Defendant maintained the accuracy of the previous statement. Agent Morton said the Defendant agreed to take a polygraph examination and said he would like to clear his name.

Agent Mike Hannon had the Defendant sign a *Miranda* waiver and then conducted a polygraph examination, after which Agent Morton offered the Defendant a drink and showed him the restroom's location. Agent Morton thought he gave the Defendant some water.

Agent Morton and Agent Hannon then questioned the Defendant further about his previous statements and about areas of concern from the polygraph examination. Agent Hannon advised the Defendant that the Defendant had problems with his polygraph responses about the victim. Agent Morton testified that the Defendant was emotionless when asked about the victim and that Agent Morton thought they were "getting nowhere." Agent Morton said he began asking more stern and direct questions, including whether the Defendant killed the victim. Agent Morton said the Defendant nodded affirmatively but answered no. Agent Morton said he told the Defendant he thought the Defendant either killed the victim or knew what happened. Agent Morton said that at this point, the Defendant became "somewhat agitated" and said, "[I]f you're going to accuse me then I think I need an attorney." Agent Morton said that he and Agent Hannon stopped questioning the Defendant at this point. Agent Morton said, "I told Mr. Self if that's what he wanted, if he needed an attorney, that we would stop right then and he would have an attorney." When asked what happened next, Agent Morton explained:

> He kept talking. He started asking questions from myself and Agent [Hannon]. They were kind of hypothetical questions. What if this was accidental or what, you know, what would happen to someone if this – if it was an accidental shooting, or what would happen if it was a justified – what would happen to – and got to the point what would happen to him or would he go to jail, could he get out of jail, just general questions, you

-44-

know, as to what – what would occur if this was the set of facts, if it was accidental or justifiable or whatever.

Agent Morton said that the Defendant continued to ask questions and that he and Agent Hannon did not interview the Defendant. Agent Morton said that after the Defendant was advised of his right to an attorney, the Defendant continued to ask hypothetical questions. Agent Morton said he told the Defendant that the district attorney, not he and Agent Hannon, made decisions regarding the charges that would be placed. Agent Morton advised the Defendant that until they knew what happened, they did not know what charges, if any, the district attorney would pursue. Agent Morton said the Defendant stated, "I've ruined my life. I've killed my father." Agent Morton said he asked the Defendant if he would tell them what happened, and the Defendant agreed. Agent Morton said the Defendant did not say anything else about an attorney and denied he threatened or coerced the Defendant into giving a statement. Beginning at approximately 5:30 p.m. and lasting until 6:53 p.m., the Defendant gave a written statement in which he detailed the relevant events, including the victim's physical and verbal abuse of him and his shooting the victim.

Agent Morton testified that the Defendant was free to leave at any time during the questioning and that he told the Defendant this. Agent Morton said that during the process, he showed the Defendant the bathroom's location, that the Defendant went to the bathroom alone, and that the Defendant "could have walked out the door if he had wanted to."

After receiving the proof, the trial court denied the motion to suppress. In its order denying the motion, the trial court found that the Defendant invoked his right to counsel during the interview but that he later waived the right by initiating further conversation with Agents Morton and Hannon. The court found that the Defendant knew his rights and that ultimately, he knowingly and intelligently waived them.

We begin with the question of whether the Defendant was in custody for purposes of *Miranda* at the time he gave the inculpatory statement. The United States and Tennessee Constitutions dictate that a person shall not be compelled to give evidence against himself. U.S. Const. amend V; Tenn. Const. art. 1, § 9; *see State v. Berry*, 141 S.W.3d 549, 576 (Tenn. 2004). As a predicate to admissibility of a confession, the police are required to inform an individual in custody and subject to State-initiated questioning of his Fifth Amendment rights. *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* protections apply to a custodial interrogation, which is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 444. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on

the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). This court has said, however, "[Q]uestioning initiated by the accused is not interrogation in the *Innis* sense." *State v. Land*, 34 S.W.3d 516, 524 (Tenn. Crim. App. 2000); *see Edwards v. Arizona*, 451 U.S. 477, 484 (1981). Once a person in custody has made an unequivocal request for an attorney, questioning must cease until he has had the opportunity to confer with counsel, unless the person initiates further conversation with the authorities. *Edwards*, 451 U.S. at 484-85.

In determining whether a person is in custody for *Miranda* purposes, a court must look to the totality of the circumstances to determine whether "a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). Our supreme court has said that in making this determination

> Some factors relevant to that objective assessment include the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Anderson*, 937 S.W.2d at 855; *see State v. Dailey*, 273 S.W.3d 94, 102 (Tenn. 2009).

In the present case, the trial court did not make an explicit finding about whether the Defendant was in custody. As we have noted, the court determined that the Defendant invoked but later waived his right to counsel. We infer from this determination that the court considered the Defendant in custody because inquiry into whether the Defendant invoked but eventually waived his right to counsel was pertinent only if the Defendant was in custody and afforded *Miranda* protections. As we have stated, we must defer to this factual determination unless the evidence preponderates against it. *Odom*, 928 S.W.2d at 23.

We note that the Defendant went to the sheriff's office voluntarily and that he was transported by a relative. The Defendant was questioned first by Agent Morton and Detective Morgan before being given a polygraph examination by Agent Hannon and eventually being questioned by Agent Morton and Agent Hannon. The Defendant gave the first statement around 1:29 p.m., and the second statement concluded around 6:53 p.m. During this time, the Defendant was offered a drink, was shown the restrooms, and was permitted to wander at will when he went to use the restroom. The office area where the interviews occurred was inside a secure area, but the doors were unlocked from the inside and marked by exit signs. Although the victim was a Greeneville police officer, the officers who questioned the Defendant were a Greene County Sheriff's detective and TBI agents, and the Defendant was questioned at the Greene County Sheriff's office. The defendant was made aware that he was free to leave at any time. Agent Morton acknowledged asking stern and direct questions after the polygraph examination about whether the Defendant killed the victim, but the evidence does not show that the Defendant was the subject of threatening, coercive, or overbearing interrogation. Agent Morton testified that after the Defendant made the statement about needing an attorney, Agent Morton told the Defendant that if the Defendant wanted an attorney, questioning would stop and the Defendant would have an attorney. The Defendant asked hypothetical questions about his culpability depending upon the circumstances of the offense. The agents did not ask questions, and the Defendant eventually admitted that he had ruined his life and had killed the victim.

In view of the totality of the circumstances, we conclude that the evidence preponderates against the trial court's implicit finding that the Defendant was in custody. The evidence shows that the Defendant went to the sheriff's office of his own accord, that he agreed to talk to the authorities, that he was allowed to go to the restroom unaccompanied, that he was made aware that he was free to leave at any time, that the exit doors were unlocked from the inside, and that he was not subject to coercive or overbearing interrogation techniques. We conclude, further, that because the Defendant was not subject to custodial interrogation, the *Miranda* requirements did not apply. The trial court did not err in denying the motion to suppress, and the Defendant is not entitled to relief on this basis.

## II

## EXERCISE OF PEREMPTORY CHALLENGE

The Defendant contends that the State improperly exercised a peremptory challenge to a prospective juror for a race-based reason, in violation of *Batson v.*

*Kentucky*, 476 U.S. 79 (1985), because she expressed an interest in the "Trayvon Martin case."[6] The State contends that the trial court did not err in overruling the Defendant's *Batson* challenge because the prosecution provided race-neutral explanations for its exercise of a peremptory challenge.

*Batson* held that the Equal Protection Clause prohibits the prosecution from excluding potential jurors based solely upon race. *See Batson*, 476 U.S. at 89; *see also Georgia v. McCollum*, 505 U.S. 42, 59 (1992) (extending the prohibition against race-based peremptory challenges to those made by a defendant). When a party raises a *Batson* claim, the party must establish a prima facie case of purposeful discrimination.[7] *Batson*, 476 U.S. at 96. A defendant establishes a prima facie case of purposeful discrimination by showing that the State "excluded members of a cognizable racial group from the jury pool." *State v. Echols*, 382 S.W.3d 266, 281-82 (Tenn. 2012); *State v. Ellison*, 841 S.W.2d 824, 826 (Tenn. 1992); *see also Powers v. Ohio*, 499 U.S. 400, 416 (1991). Next, the party that exercised the peremptory challenge is allowed the opportunity to rebut the prima facie showing by offering a race-neutral reason for its peremptory challenge. *Batson*, 476 U.S. at 97. The court must then determine whether the objecting party has established purposeful discrimination. *Id.*

---

[6] In a case that received significant media attention and public interest, Trayvon Martin, an unarmed seventeen-year-old African-American, was shot and killed by George Zimmerman, a Hispanic adult, during a confrontation that began after Mr. Zimmerman followed Mr. Martin in the Florida neighborhood in which Mr. Zimmerman served as a neighborhood watch member. *See* Campbell Robertson & John Schwartz, *Shooting Focuses Attention on a Program That Seeks to Avoid Guns*, New York Times (Mar. 22, 2012) http://www.nytimes.com/2012/03/23/us/trayvon-martin-death-spotlights-neighborhood-watch-groups.html?_r=2 (last visited July 29, 2016). Mr. Zimmerman was charged with and acquitted of second degree murder. David G. Savage & Michael Muskal, *Zimmerman Verdict: Legal experts say prosecutors overreached*, Los Angeles Times (July 14, 2013) http://articles.latimes.com/2013/jul/14/nation/la-na-zimmerman-legal-20130715 (last visited July 29, 2016). Following an acquittal, public outcry led the NAACP to petition the United States Department of Justice to conduct a civil rights investigation. *Nearly 450K sign NAACP petition calling for DOJ investigation into Trayvon Martin shooting*, Orlando Sentinel (July 14, 2013) http://articles.orlandosentinel.com/2013-07-14/news/os-thousands-sign-tayvon-martin-petition_1_naacp-petition-doj (last accessed July 29, 2016). We note that Mr. Zimmerman's acquittal occurred on July 13, 2013, and jury selection in the present case occurred approximately one month later, on August 12, 2013. Greg Botelho & Holly Yan, *George Zimmerman found not guilty of murder in Travyon Martin's death*, CNN (July 14, 2013), http://www.cnn.com/2013/07/13/justice/zimmerman-trial/index.html (last accessed July 29, 2016).

[7] We note that although *Batson* required the defendant raising a claim of purposeful discrimination to be of the same race as the prospective juror against whom the State exercised a peremptory challenge, *Powers v. Ohio*, 499 U.S. 400, 415 (1991), later held a defendant had third-party standing to raise an equal protection claim on behalf of the excluded juror even if the juror is not of the same race as the defendant.

A party's race-neutral explanation in response to a *Batson* claim that consists merely of a denial of discriminatory motive or an assurance of good faith is insufficient. *See id.* Rather, the race-neutral reason must be "related to the particular case to be tried." *Id.* at 98. However, at this stage, the trial court need not find that the explanation itself is "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 768 (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)). If the prosecution is able to offer any race-neutral reason for the strike, the trial court must then examine the proffered race-neutral explanation in light of all the evidence and assess whether the explanation is plausible. *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005); *see Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 906 (Tenn. 1996). In this regard, the opponent of the peremptory strike bears the burden of proving purposeful discrimination. *Purkett*, 514 U.S. at 768. In making its determination,

> The trial judge must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination. The trial court's factual findings are imperative in this context. On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous.

*Woodson*, 916 S.W.2d at 906; *see State v. Hugueley*, 185 S.W.3d 356, 374 (Tenn. 2006).

The record reflects that the prospective juror was an African-American woman. She was questioned individually by the defense about her employment and her affinity for the television program "Law & Order." She was asked if it was correct she liked the program and whether she understood the trial would take more than one hour, the length of an episode of the program. She was not asked any other individual questions, and none of the questions posed to the group pertained to the Trayvon Martin case.

The State exercised a peremptory challenge to the prospective juror, and the defense objected on the basis that the challenge was race-based and that the State's challenge was the second peremptory strike to a black prospective juror. When asked by the court if the challenge was race-based, one prosecutor stated:

> Well, we debated on her for a great deal at the table. She had made multiple references to the Trayvon Martin case and basically we took it that she expressed dissatisfaction with the verdict. And we had some question about whether she might base her decision on emotion rather than rule of

law. We didn't get into the questioning. We didn't want to embarrass her. She's worked at Eastman for a considerable amount of time. So there were things that made us [think] she would be a good juror but with challenges still out there we felt that it was better to not risk having someone that would base it on emotion rather than the rule of law . . . .

Defense counsel interjected that both the President and the United States Attorney General had expressed dissatisfaction with the verdict in the Trayvon Martin case and argued that allowing the State to exercise a peremptory challenge to this juror was a "blatant *Batson* violation." The second prosecutor responded:

Your Honor, the defense very thoroughly questioned the jury about passing judgment on news articles, what's in the media instead of what happens in the court of law. And right there we have got proof of someone on the jury who makes reference that we believe showed she was concerned that justice wasn't carried out. She wasn't in that trial.

The first prosecutor added:

That is not only the answer to a question on our questionnaire that concerned us. Her brother had been convicted of a robbery case. There was also mention of fairness about people being wrongfully – justice not being done in cases. And that concerned us. We knew the situation of race, but looking at all those questions it was not just solely based on the Trayvon Martin case. There [are] several different factors in answers on the questionnaire.

The second prosecutor added, "I forgot about the armed robbery." The court stated, "Based on the representations of counsel on that," the State had shown a "reasonable excuse" and the prospective juror would be excused.

"[D]etermination of the prosecutor's discriminatory intent or lack thereof turns largely on the evaluation of the prosecutor's credibility, of which the attorney's demeanor is often the best evidence." *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994). The trial court is particularly suited to assessing an attorney's credibility. *State v. Kiser*, 284 S.W.3d 227, 256 (Tenn. 2009); *see Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion). The reviewing court gives great deference to these findings and will not set them aside unless they are clearly erroneous. *State v. Kiser*, 284 S.W.3d 227, 256 (Tenn. 2009). We conclude that the trial court's decision to base its ruling on the "representations of counsel" was a finding that the prosecutors' statements were credible.

The record reflects that the Defendant established a prima facie case of race-based discrimination. The State's explanation of its peremptory challenge to the juror includes two components: that she expressed dissatisfaction with the verdict in the Trayvon Martin case and might decide the present case on emotion rather than the law and that her brother had been convicted of armed robbery and she questioned whether "justice [was] being done." The Supreme Court has said, "[A] peremptory strike shown to have been motivated in substantial part by discriminatory intent [cannot] be sustained based upon any lesser showing [than that the factor was not determinative] by the prosecution." *Snyder v. Louisiana*, 552 U.S. 472, 485 (2008). Because the record reflects that the State's concern about the prospective juror's thoughts about the Trayvon Martin case were a substantial motivating factor in its decision to exercise a peremptory strike, we focus on this component of the State's proffered explanation.

In that regard, we note that the prosecution's concerns that the prospective juror was dissatisfied with the verdict in the Trayvon Martin case and that she might decide the present case based upon emotion, not law, is not addressed by her responses during voir dire. We likewise note that the prosecutors' statements about their concerns do not specify the basis in the questionnaire responses that formed the basis for the concerns. The record does not reflect, however, that the trial court reviewed and considered the prospective juror's questionnaire, and it likewise does not reflect the full contents of the questionnaire. We acknowledge that one of the defense attorneys, after the trial, filed an affidavit in which she set forth selected contents of the juror questionnaire. The affidavit does not represent these excerpts as reflective of every question and answer that might be considered relevant to the Trayvon Martin case. We also acknowledge that after the case was pending in this court, we denied the Defendant's motion to supplement the record with several juror questionnaires, including the one completed by the prospective juror in question. The State opposed the motion, which was addressed at the oral argument of the appeal. We denied the motion to supplement, citing Tennessee Rule of Appellate Procedure 24(g) and *State v. Rogers*, 188 S.W.3d 593, 608-11 (Tenn. 2006) (holding that the Court of Criminal Appeals erred in supplementing appellate record with material that was never considered by the trial court). As with the juror questionnaire itself, without some indication that the trial court considered the juror questionnaire in ruling on the *Batson* challenge, we do not view the later-filed affidavit regarding partial contents of the questionnaire to be relevant to our review of the propriety of the trial court's ruling.

To the extent that the record reflects the trial court's knowledge, at the time the *Batson* challenge was made, of the prospective juror's responses to the questionnaire, this knowledge consists of the prosecutors' explanation of the reason for the peremptory challenge. As we have noted, the prosecutors expressed concern that the prospective juror made multiple references to the Trayvon Martin case. They interpreted her questionnaire answers as showing dissatisfaction with the verdict in that case and were

concerned she would decide the present case on emotion and not the law. The trial court overruled the *Baston* challenge "[b]ased on the representations of counsel," and as we have noted, discriminatory intent is largely determined based upon the prosecutor's credibility, typically evidenced by the attorney's demeanor, an assessment for which the trial court is particularly suited. *Smith*, 893 S.W.2d at 914; *Kiser*, 284 S.W.3d at 256.

We have afforded great deference to the trial court's finding that the prosecutors' race-neutral explanations were credible, and upon review, we cannot conclude that the court's finding was clearly erroneous.[8] *See Woodson*, 916 S.W.2d at 906. We cannot presume from a silent record that the court reviewed and considered the prospective juror's questionnaire responses as an adjunct to assessing the prosecutors' credibility, nor can we presume what the contents of the questionnaire are, given its absence from the record. We, again, note that the affidavit filed by defense counsel contained only excerpts of the questionnaire and the prospective juror's responses and does not purport to be a complete representation of all of the questions and responses that might be considered relevant to the Trayvon Martin case.

In reaching our conclusion, we are mindful of the Defendant's argument that the prospective juror's having recently "engaged in an online debate regarding a recent issue of racial controversy in America" was not a race-neutral justification. We acknowledge that the Trayvon Martin case involved race-related issues; however, the record before us does not show whether the prosecutors perceived that the prospective juror's purported dissatisfaction with the Trayvon Martin verdict was for race-based reasons. We also

---

[8] We distinguish this case from the Supreme Court's recent decision in *Foster v. Chatman*, 136 S. Ct. 1737 (2016). In *Foster*, the Supreme Court concluded that the prosecution's race-neutral explanations were not credible in light of evidence from the record that the prosecutor misrepresented his reasons for striking African-American jurors and in light of extensive documentation that the race of the jurors was a primary consideration in the prosecution's use of its peremptory strikes. *Id.* at 1744, 1750, 1752-54 (recounting evidence of the prosecution's seeming obsession with race, including that the prosecution's venire lists highlighted the names of African-American jurors and marked them with the letter "B"; that the first five names on a document entitled "definite NO's" were the names of the only remaining African-Americans on the panel; that one document contained a notation reading "No *Black* Church"; and that someone had circled the response to race on the questionnaires of several black prospective jurors). In *Foster*, the Supreme Court noted that the evidence showed that many of the reasons given for striking black panelists applied to white panelists who were chosen to serve in the jury and that "the shifting explanations, the misrepresentations of the record, and the persistent focus on race in the prosecution's file" led to the conclusion that there was discriminatory intent. *Id.* at 1754. Unlike *Foster*, the case before us does not present a record that suggests that the proffered race-neutral reasons were flagrantly pretextual.

reject the notion that concern about racial justice is an issue unique to black Americans such that we should infer, as the defense suggests, that the only logical conclusion to be drawn from the State's exercise of a peremptory strike against a black prospective juror who was interested in a well-publicized criminal case involving race issues is that the strike was exercised with racial animus. Perhaps the Defendant's argument captures one conclusion that might be drawn, but given the state of the record, we cannot conclude that the trial court erred in accepting the State's explanation as a race-neutral justification for the peremptory challenge. The Defendant is not entitled to relief on this basis.

## III

## SUFFICIENCY OF THE EVIDENCE

The Defendant contends that the evidence is insufficient to support the conviction because the State failed to prove the killing was premeditated. The State contends that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (*quoting State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. *See* T.C.A. §§ 39-13-201 (2014), -202 (2014). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014)

-53-

(defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). In determining whether premeditation is shown,

> Several circumstances may be considered indicative of premeditation, including: use of a deadly weapon on an unarmed individual; the particular cruelty of the killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; making preparations to conceal the crime before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing.

*State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).

The Defendant argues that the evidence does not support a finding beyond a reasonable doubt that he premeditated the killing, noting the absence of proof that he threatened the victim beforehand and that he took preparatory actions. The Defendant also notes that he fired only a single shot and that it stovepiped, which he says indicates he was not prepared for the shot.

The evidence, viewed in the light most favorable to the State, shows that the Defendant initially gave a statement denying involvement in the killing but later admitted his involvement. The Defendant claimed that the victim had been abusive and that the victim assaulted him over his use of a towel at 2:00 or 3:00 a.m. on the day the killing occurred. The Defendant was involved in a minor traffic accident at school that afternoon. The Defendant claimed that after he arrived home, the victim had cursed at him when he forgot to wake the victim at 5:45 p.m. The Defendant decided to confront

the sleeping victim, went into a home office, took the victim's loaded police weapon from its holster, and went to the victim's bedroom, where he shot the sleeping victim in the back of the head. After the shooting, the Defendant did not render aid or call for assistance and instead ransacked the house to make it look as though a burglary had occurred. A sign offering the Defendant's car for sale was found in the home. The Defendant left the scene, taking the weapon with him and, after attaching it to a brick with zip ties, disposed of it in a pond. When the victim did not report for work, the Defendant feigned lack of knowledge of the victim's well-being. The Defendant did not divulge any knowledge of what happened to the victim until the following day. He initially cast suspicion on a homeless man who had been seen in the neighborhood.

Although the defense presented evidence that the shooting had been accidental and had been the result of a startle response resulting from the Defendant's abuse-related PTSD, the jury rejected this theory, and such a determination lay within its province as the trier of fact. Relative to premeditation, the evidence viewed in the light most favorable to the State shows that the Defendant decided to confront the victim, obtained the victim's gun from a holster in the room where the victim stored the gun, walked to the sleeping victim's bedroom, and held the gun with his finger on the trigger. After the shooting, the Defendant failed to render aid or call for assistance, ransacked the house to make it look as if the killing occurred during a burglary, fled the scene, secured a brick to the gun, drove to a park to dispose of the gun, and threw the gun into a pond. We conclude that the evidence is sufficient to support the verdict. The Defendant is not entitled to relief on this basis.

## IV

### UNDISCLOSED EVIDENCE

The Defendant contends that multiple discovery violations rendered the trial unfair. He contends that the trial court erred in denying his motions for a mistrial based upon the State's failure to disclose evidence of (1) Agent Scott's notes made during examination of the victim's bedcovers and (2) Agent Carlisle's notes about the alarms set on the clocks in the victim's bedroom. His fair trial issue combines these two evidentiary nondisclosures with the State's failure to disclose the Defendant's statement to police that his iPod was missing from the scene. The State contends (1) that the court did not abuse its discretion in denying the motions because the Defendant failed to show discovery or evidentiary violations and because no manifest necessity for a mistrial existed and (2) that the Defendant failed to establish a violation of his right to a fair trial.

## A. <u>Mistrial Issues</u>

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

## 1. <u>Agent Scott's Notes</u>

The Defendant's first complaint relates to notes Agent Scott made when examining the victim's bedcovers for gunshot residue. The Defendant acknowledges receipt of Agent Scott's two-page report but contends the State failed to disclose the notes. The State counters that the issue is waived because Agent Scott's report is not in the appellate record and that, in any event, the Defendant has not shown that the report was material to the defense.

Relative to disclosure of evidence of this nature, Tennessee Rule of Criminal Procedure 16(a)(1)(G) provides:

> (G)    Reports of Examinations and Tests. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph the results or reports of physical or mental examinations, and of scientific tests or experiments if:
>
> > (i)    the item is within the state's possession, custody, or control;
>
> > (ii)    the district attorney general knows--or through due diligence could know--that the item exists; and
>
> > (iii)    the item is material to preparing the defense or the state intends to use the item in its case-in-chief at trial.

During cross-examination, the defense questioned Agent Scott, ostensibly to highlight the absence of gunshot residue on the victim's bedcovers consistent with the witness's written report, which the defense received in pretrial discovery. During cross-examination, the following exchange occurred:

-56-

Q.    . . . [Y]ou did the testing, is that correct?

A.    That is correct, yes, sir.

Q.    And you found no evidence of gunpowder residue on the cloth, is that correct?

A.    That's not exactly correct. It is what my report states. There were a very few stray gunpowder particles but the minimal number of those did not allow me to make an informed opinion about how they may have been deposited there.

When asked if he had records of his examination of the evidence to support his findings, the witness indicated he did, which is how the undisclosed notes came to light.

The defense theory relative to the bedcovers was that the absence of gunshot residue showed that the firearm was fired from a distance greater than four feet, which the defense theorized would indicate the shooting was accidental. As one of the defense attorneys explained when making the motion for a mistrial:

[O]ne of the issues the jury is going to wonder is how was he able to hit right behind the head. The further away he is, the more unlikely that he was able to sight this thing. The more likely it was, it was just an accident. The close[r] he was the more it's an intentional shooting. I thought the garment, the distance was critical in this case.

Counsel represented that this point had been significant to formulation of the defense and that he would not have pursued this line of questioning had he known about the contents of the undisclosed notes. The court denied the motion for a mistrial and asked if the defense wanted the testimony stricken, which the defense had initially requested. Two of the defense attorneys stated that they declined to have the testimony stricken and preferred to stand on the motion for a mistrial. Cross-examination resumed, with the witness agreeing that he could not tell whether the weapon was fired within four feet or beyond four feet, that is was possible the particles were transferred onto the bedcovers due to the method of packaging, that the bedcovers were not examined until almost one year after the homicide, and that the presence of scant gunpowder residue "had no meaning" to him.

The State argues that consideration of the issue is waived because Agent Scott's report is not in the record. The record reflects that Agent Scott's report and his notes

were marked for identification at the trial, but a notation of the trial court clerk indicates the clerk had been unable to locate them when preparing the appellate record. The record reflects, however, that after the trial, the defense moved to supplement the record with the report and the notes, and the trial court granted the motion. We conclude that the record contains the necessary documents and that consideration of the issue is not waived.

Turning to the merits of the issue, we begin with whether a discovery violation occurred. In that regard, the record reflects that the Defendant filed a discovery request and that the notes were within the State's, though not the prosecutor's, possession. The record reflects that one of the prosecutors stated that he had only been provided with the report and that he had not seen the notes previously. The court credited the prosecutor's statement in this regard.

With regard to the materiality of the undisclosed notes to preparation of the defense, we acknowledge that the defense attempted to show the shooting was accidental based in part upon the distance from which the shot was fired and that the presence or absence of gunshot residue on the victim's bedcovers was relevant to the distance from which the shot was fired. We likewise acknowledge that counsel pursued a line of cross-examination that he stated he would not have chosen had he been provided with Agent Scott's notes. Despite the approach the defense employed, Agent Scott's testimony does not support a conclusion that the evidence in the undisclosed notes was material. Agent Scott acknowledged his report stating that no gunpowder residues were found. On cross-examination, he agreed that the particles mentioned in his notes and about which he testified were "miniscule," that he could not make a determination from them regarding whether the weapon was fired from within or beyond four feet, and that the scant residues he found had no meaning to him. In the evidentiary sense, the undisclosed notes did not contain information that was material to the Defendant's guilt or innocence.

Viewed in this light, we cannot conclude that the trial court abused its discretion in denying the motion for a mistrial. We note, as well, that the trial court expressed its inclination to give a curative instruction, but the defense declined this remedy. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The Defendant is not entitled to relief on this basis.

## 2. **Agent Carlisle's Notes**

The Defendant contends that the trial court erred in denying his motion for a mistrial based upon the State's nondisclosure of Agent Carlisle's notes about the alarms set on two clocks in the victim's bedroom. The State counters that the Defendant waived

consideration of the issue because he did not make a contemporaneous objection or motion for a mistrial when the evidence was offered. The State also contends that the Defendant has not shown a violation of the Rules of Criminal Procedure and that he failed to establish prejudice from the nondisclosure.

Agent Carlisle, who led the TBI's Violent Crime Response Team that processed the scene, testified on direct examination by the State that two alarm clocks were in the victim's bedroom, that one was set for 3:30 p.m., and that one was set for 4:30 p.m. Defense counsel interjected during direct examination, "Your Honor, could she testify as to which one was which." The prosecutor who was conducting the direct examination then asked the witness to clarify, and Agent Carlisle responded that a clock on the right side of the victim's bed if standing at the bed's foot had an alarm set for 3:30 p.m. and that a clock on the left side of the victim's bed had an alarm set for 4:30 p.m. On cross-examination, defense counsel elicited that Agent Carlisle referred to notes she made at the scene during her testimony about the alarm clocks.

During an in-chambers conference immediately after Agent Carlisle's testimony, the defense made a motion for a mistrial and requested, alternatively, that the court instruct the jury to disregard the testimony about the clocks. The defense noted that a pretrial order directing the State to provide the defense with "[a]ll investigative notes" and "field notes" and that Agent Carlisle's notes regarding the existence of a second clock and the times for which the alarms were set on both clocks had not been disclosed before the trial. Defense counsel argued that the inference which arose from Agent Carlisle's testimony about the two clocks was that the one on the left, which was set for 4:30 and which was closer to the victim's body, was the alarm that some of the witnesses heard when they arrived at the scene. The defense argued that the import of this testimony for the State was to show the victim was dead before 4:30 p.m., which was contrary to the Defendant's pretrial statement regarding the timeline of the relevant events, and that counsel would have prepared his cross-examination differently had he known of the second clock and the clocks' respective alarm times. Counsel expressed concern that the defense had prepared for trial based upon incomplete information and that multiple undisclosed items had come to light during the course of the trial. Counsel stated:

> Now, I would have never gone into the alarm clocks to give them the opportunity to get back up and ask her to look at her notes as to where the alarm clocks were, left or right, had I known that her field notes said that and they would not have been able to do that. That's the problem.
>
> . . . .

. . . I stepped into something that I was misled because of the report I was given and I wasn't given that report.

. . . .

. . . I was given the typewritten report. I was not given this report that said that the 4:30 was on the left-hand side.

Defense counsel noted that only one alarm clock was listed on an exhibit list. We note, however, the testimony of Detective Fincher and Agent Carlisle that the alarm clocks were not collected as evidence.

We address, first, the State's waiver argument. In this regard, we do not view the Defendant's motion for a mistrial and alternative motion to strike the testimony as untimely. The Defendant promptly raised the issue in an in-chambers conference immediately following the witness's testimony, which was brief. We will consider the issue on its merits.

Agent Carlisle's notes were not within the scope of Tennessee Rule of Criminal Procedure 16(a)(1)(G) pertaining to reports of examinations or tests performed by expert witnesses. The record reflects, however, that the notes were within the purview of evidence the State was required to disclose pursuant to agreed pretrial orders. One order required the State to disclose "tangible objects" within its possession, custody, or control that were material to preparation of the defense. Agent Carlisle's notes were tangible objects material to preparation of the defense. Another order directed disclosure at least thirty days before the trial of "'*Jencks*' material." Tennessee Rule of Criminal Procedure 26.2 defines the evidence that is contemplated as so-called *Jencks* material. *See State v. Caughron*, 855 S.W.2d 526, 534-35 (Tenn. 1993); *see generally Jencks v. United States*, 353 U.S. 657 (1957). The rule provides:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

Tenn. R. Crim. P. 26.2(a). As we have stated, the parties agreed and the court ordered the State to provide this material at least thirty days before the trial. The parties do not dispute that Agent Carlisle's notes were not disclosed.

-60-

The State argues that no violation of Rule 26.2 occurred because the notes were provided at the beginning of Agent Carlisle's cross-examination. The State is correct that the disclosure of the notes occurred within the dictates of Rule 26.2, but it has not addressed its failure to disclose the notes in accord with the pretrial order requiring thirty days' advance disclosure. To the extent that the belated disclosure pursuant to the order may have impaired the defense, we will consider whether the court should have granted a mistrial.

In this regard, we note the State's argument in its brief that "the timing of the murder was never in serious contest during the trial" and that the Defendant admitted shooting the sleeping victim in the back of the head. The transcript reflects that the State's closing argument included the assertion that the alarm clock Captain Dyke heard when she entered the house was the one on the left of the victim's bed, which Agent Carlisle's testimony established was one set to 4:30. The prosecutor argued that the Defendant's account of the events was inconsistent with this proof and that the evidence, including the text messages between the Defendant and C.P. and the time necessary for the Defendant to complete the actions he described after the shooting, suggested that the shooting "happened at a different time and possibly happened under different circumstances than what this defendant tries to tell you through his statement."

Defense counsel noted during the hearing on the motion that all the other witnesses testified to one alarm clock and that Agent Carlisle's testimony was "[t]he first time we have heard of two alarm clocks in this case." However, the prosecution replied that the report stated "that one was 3:30, the other 4:30," and that defense counsel could have clarified the positions of the clocks with the witness. The prosecutor noted that he "naturally assumed, well, maybe she knows where those clocks are in the room." The prosecutor also stated that "those are the times she documented which was provided in discovery for sure." In cross-examining the witness after the hearing on the mistrial, defense counsel acknowledged, "[I]n your report was something about two alarm clocks, correct?" Agent Carlisle's report is not included within the appellate record. The record does include a motion for a continuance made by the State and filed on November 30, 2012. This motion refers to a Special Agent Celeste White, who led the TBI forensics team and was preparing to take a maternity leave. The motion notes that Agent White made "observations concerning the times set on the alarm clocks in the bedroom of Roger Self" and that Agent White "memorialized the alarm times set on the clocks." Accordingly, it appears that the defense was aware of the presence of two alarm clocks but was not aware that the alarm clock which was sounding when the body was discovered was the clock that had an alarm set for 4:30 p.m.

Upon review, we conclude that the trial court did not err in denying the motion for a mistrial based upon the State's failure to comply with its obligation to disclose this

information pursuant to the discovery orders. We in no way condone the TBI's failure to provide the prosecutors with all relevant materials generated by TBI agents in the investigation, and we note two instances of this having occurred in the present case. On the facts of this case, however, the trial court did not err in determining that no manifest necessity for a mistrial existed. The Defendant received the notes at the time specified by Rule 26.2. It appears that the Defendant was aware that there were two alarm clocks with alarms set for 3:30 and 4:30, but the Defendant was not aware of the placement of the alarm clocks. The defense was able to raise the possibility that the clock set to 4:30 had the capability for multiple alarms by eliciting testimony on cross-examination that the clocks were not preserved and that Agent Carlisle did not examine the clocks to determine if multiple alarms were set. We note, as well, the other evidence that contradicted the Defendant's claim the shooting was accidental. The Defendant procured the weapon, went to the victim's bedroom, and shot the unarmed, sleeping victim. After the shooting, the Defendant made no attempt to assist the victim or to call emergency personnel. He ransacked the scene in an attempt to make it appear the victim was killed during a burglary, and he disposed of the weapon. He initially professed no knowledge of the victim's well-being when contacted by Captain Crum about the victim's work absence and was not forthcoming with the authorities on the night of the shooting. Any evidence that the Defendant's timeline for the events was at odds with the State's proof was insignificant in light of the totality of the proof. The Defendant is not entitled to relief on this basis.

## B. **Fair Trial**

The Defendant contends that he was denied his right to a fair trial by the State's failure to disclose Agent Scott's notes, Agent Carlisle's notes, and a statement the Defendant made to Detective Fincher that the Defendant's iPod was missing from the house. The statement occurred during the walk-though of the house on the morning after the crimes and was not part of the questioning that occurred later at the sheriff's office.

As a component of due process, a criminal defendant is afforded the right to a fair trial and the right to present a defense. *See* U.S. Const. Amends. VI, XIV; Tenn. Const. art. 1, § 9. As we have stated, we are dismayed by the TBI's failure to provide all documents relevant to its investigation to the prosecutors. The district attorney's office cannot evaluate all evidence to determine that which must be disclosed if the district attorney's office is unaware of the existence of an evidentiary item or fact. The prosecutor's lack of knowledge of discoverable evidence does not lessen the State's obligation to provide it. *See Strickler v. Greene*, 527 U.S. 263, 275 n.12 (1999) (noting that the obligation to disclose evidence pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), extended to evidence not in the prosecution's possession but known to others

acting on behalf of the prosecution, including the police); *State v. Jackson,* 444 S.W.3d 554, 594 (Tenn. 2014).

That said, we have concluded that Agent Scott's notes were not material, that Agent Carlisle's notes were provided in compliance with Tennessee Rule of Criminal Procedure 26.2, and that the failure to provide Agent Carlisle's notes at the time specified by a pretrial order did not create a manifest necessity for a mistrial. The Defendant has not explained how the information about the allegedly missing iPod was material to the defense, and our review of the record indicates it was not. Although the Defendant staged the scene to make it appear the victim was shot during a burglary, he later admitted to the police that he had shot the victim. His initial claim that an iPod was missing from the house was not material to the defense. The Defendant was not denied his right to a fair trial by discovery violations, and he is not entitled to relief on this basis.

V

## VIOLATION OF EVIDENTIARY RULINGS

The Defendant contends that the trial court erred in denying his motions for a mistrial based upon the State's eliciting evidence in violation of the court's pretrial evidentiary rulings that (1) Dr. Brietstein could not testify to his opinion that the Defendant did not shoot the victim accidentally, (2) the State could not introduce evidence that the Defendant stood to inherit from the victim, and (3) the State's witnesses could not refer to the victim as "the victim."

### A.  Opinion Testimony of Dr. Brietstein

The Defendant contends that the court erred by denying his motion for a mistrial after Dr. Brietstein testified that, in his opinion, the shooting was not an accident. This testimony was in violation of a previous court ruling that prohibited Dr. Brietstein from testifying about any opinion that the shooting was accidental or intentional, his report having stated he did not think the shooting was accidental. The State contends that the Defendant waived the issue by failing to cite to legal authority for the proposition that the testimony was inadmissible and that the trial court did not err in denying the motion for a mistrial.

Dr. Brietstein examined the Defendant at the request of the State, although Dr. Brietstein testified as a defense witness when the State chose not to call him. In a bench conference regarding the admissibility of proof from the expert witnesses, the trial judge stated:

[T]he issue as far as I'm concerned about all these experts is whether or not this man is suffering from post-traumatic stress syndrome. That's the issue. Whether or not because of that he had a mental capacity to intentionally – I'm not putting it that way. Whether it affected his mental state as he went into that room because he says it's an accident. So it's not a question of whether or not he had the mental state to pull the trigger, it's a question of whether it was an accident. Dr. Brietstein goes way off on a limb, if you read it, makes some conclusions that are in the exclusive provi[]nce that he is no more capable of rendering than I am. I haven't seen from the other experts what their conclusions are but if they go the line that Dr. Brietstein went, they don't have the expertise to render those opinions. I think you know what I'm talking about is that nobody has . . . the right to come in this court and say I have concluded that this is an accidental shooting or this was an intentional shooting. But they do have the right to come in here and say it's [PTSD].

In his written report, which the defense had Dr. Brietstein read during his direct examination testimony, he stated:

In an attempt to explain the events that led up [to] the shooting of his father, the defendant presents a detailed history of physical and emotional abuse by his father, not only of him but also of his mother prior to her untimely death. While there appears to be no supporting evidence of such abuse, this contention is believable, despite the fact that those who knew him best, including his grandmother, who said she knew nothing about it, his girlfriend at the time, who apparently also knew nothing about it, his closest friend, who said he was unaware of any issues between Ethan and his father, and fellow police officers, who have stated that Ethan and his father ended all their conversations by telling each other that they loved one another. What makes this more believable is the fact that abusive families tend to be highly insulated and it is not necessarily uncommon for such abuse to be hidden from anyone outside of the immediate family. In addition, Ethan's description is highly detailed and consistent with the type of abuse perpetrated by someone who presents one image to the public and another image at home. The fact that the abuse escalated after his mother's death is also consistent with the likelihood that his mother served as a buffer for his father's abusive temperament, which upon her death was directed upon the defendant. By his account, the level of abuse escalated prior to the shooting of his father, as [it] was Ethan's desire to stand up to his father, emancipate himself, and finally show his father, "Who the bigger man was." Thus, Ethan, being a victim of abuse, felt as if he had had

-64-

enough, took matters into his own hands and decided to confront his father with the gun, the outcome being all but inevitable.

During cross-examination, the prosecutor asked Dr. Brietstein what he meant when he said in the report that the outcome was all but inevitable. Dr. Brietstein responded, "Well, what I mean is what I go on to say and explain is that I do not believe this to have been an accident." Defense counsel moved for a mistrial. The prosecutor argued that he had been justified in asking the question because the defense chose to introduce evidence of the portion of the report stating the outcome had been all but inevitable. The prosecutor stated that although he did not know the exact answer the witness would give, he knew the witness believed the shooting was not accidental and "could tell" what the witness probably meant by the phrase. The trial court denied the motion for a mistrial without elaboration, struck the response from the record, and instructed the jury to disregard the witness's response and to give it no weight.

We consider, first, the State's argument that the Defendant waived this issue because he did not cite legal authority for the exclusion of the evidence. We are troubled by the argument that this court should overlook the prosecution's deliberate disregard of a court order. Whether or not the trial court's evidentiary ruling was legally correct is a secondary concern to a prosecutor's eliciting evidence the court has deemed inadmissible. Moreover, the State cites no legal authority for the proposition that it is the defendant's burden to demonstrate that a court order which the prosecution deliberately disregarded was legally correct. The Defendant chose to call the witness based on the trial court's ruling that a certain portion of the witness's testimony would be inadmissible. While the State could have argued that any error in putting the testimony before the jury contrary to an explicit court order was harmless based on the trial court's erroneous exclusion of the evidence, it did not do so. We note that during the jury-out hearing after the testimony, Dr. Brietstein stated that it would be misleading the jury to say that his opinion that the shooting was intentional could be given within a reasonable degree of psychological certainty. He further stated that the opinion that the shooting was intentional "would have a certain amount of validity to it but . . . whether that's more valid than your opinion or not, I don't know." The trial court initially excluded the testimony based on its conclusion that it fell outside of the witness's expertise and invaded the exclusive province of the jury. We will consider the merits of the mistrial issue.

In that regard, this court has identified three non-exclusive factors that may be pertinent to determining whether a mistrial should be granted: "(1) whether the improper testimony resulted from questioning by the state, rather than having been a gratuitous declaration, (2) the relative strength or weakness of the state's proof, and (3) whether the trial court promptly gave a curative instruction." *State v. Demitrius Holmes*, No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *4 (Tenn. Crim. App. Nov. 30, 2001); *see*

*also State v. Danny Wayne Horn*, No. E2015-00715-CCA-R3-CD, 2016 WL 561181, at *7 (Tenn. Crim. App. Feb. 12, 2016); *State v. Bennie Nelson Thomas, Jr.*, No. W2004-00498-CCA-R3-CD, at *5 (Tenn. Crim. App. Nov. 1, 2004), *perm. app. denied* (Tenn. Feb. 28, 2005); *State v. Paul Hayes*, No. W2001-02637-CCA-R3-CD, at *4 (Tenn. Crim. App. Dec. 6, 2002), *perm. app. denied* (Tenn. May 27, 2003). These factors are appropriate for the present case.

As we have stated, Dr. Brietstein's testimony was elicited by the State. Indeed, the prosecutor acknowledged that he anticipated the response he likely would, and did, receive. In this case, the State's action was particularly egregious because the testimony was the subject of a prior determination by the trial court that the evidence would not be admissible.

We have discussed previously that the State's proof was legally sufficient to support the first degree premeditated murder conviction. The State's proof included evidence that the Defendant decided to confront the victim to show him "who the bigger man was." The Defendant obtained the victim's gun from a holster in the room where the victim stored the gun, walked to the sleeping victim's bedroom, and held the gun with his finger on the trigger. The bullet entered the back of the victim's head. After the shooting, the Defendant failed to render aid or call for assistance, ransacked the house to make it look as if the killing occurred during a burglary, fled the scene, secured a brick to the gun, drove to a park to dispose of the gun, and threw the gun into a pond. The Defendant maintained that he had taken the gun into the room for protection and that the victim's snoring startled him into shooting accidentally due to his PTSD. Accordingly, the proof of the Defendant's mens rea was sufficient but not overwhelming.

Regarding the third factor, the trial court promptly gave curative instructions, telling the jury to disregard the statement and to give it no weight, and noting that it would be stricken from the record. We note that although the trial court had determined that the expert witnesses could not give an opinion on the ultimate issue of whether the Defendant intentionally or accidentally pulled the trigger, the Defendant's other expert, Dr. Kelley, testified that the Defendant suffered from PTSD due to the abuse he suffered and that this would lead to an exaggerated startle response. In recounting the Defendant's version of events, Dr. Kelley stated that the Defendant's account of the gun accidentally going off after he was startled had a "ring of genuineness." Dr. Kelley opined that the Defendant was being truthful with him.

The State argues that the trial court properly denied the motion for a mistrial, citing to *State v. Kathy Martin and Marcus Carlos West*, No. 03C01-9411-CR-00420, 1996 WL 192902, at *5-6 (Tenn. Crim. App. Apr. 23, 1996). In *Kathy Martin*, as in the case at bar, the trial court had made a pretrial ruling that an expert witness could not

testify regarding whether the defendant acted intentionally. *Id.* at \*5. The expert in *Kathy Martin* opined that thirteen-month-old victim's burn injuries were intentionally inflicted. *Id.* This testimony was not responsive to questioning, and no curative instructions were requested or given. *Id.* The court denied a motion for a mistrial, instead admonishing the witness to answer the question that had been asked. *Id.* As in the case at bar, the jury was given an expert's opinion regarding whether the defendant acted intentionally, and this testimony was in contravention of a pretrial order regarding the admissibility of the evidence. While in the case at bar the evidence appears to have been intentionally elicited by the State, the trial court here also provided curative instructions. We conclude that the trial court did not abuse its discretion in denying the mistrial. While we do not wish to minimize the impropriety of the prosecutor's action in asking a question designed to elicit a response that had been ruled inadmissible, the trial court told the jury to disregard the testimony and that the answer would be stricken from the record. The jury is presumed to follow the trial court's instructions. *State v. Jordan*, 325 S.W.3d 1, 66 (Tenn. 2010). Although the statement went to one of the ultimate issues which the jury was tasked with deciding, it was a brief statement in a lengthy trial. We note that another of the Defendant's experts later presented the contrary personal opinion: that the Defendant's account of the gun firing by accident appeared to have "a ring of genuineness." We cannot conclude that there was "no feasible alternative to halting the proceedings." *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). The trial court did not err in refusing to grant a mistrial.

## B.     The Victim's Inheritance

The Defendant contends that the trial court erred in denying his motion for a mistrial after the State elicited information about the Defendant being the sole beneficiary of the victim's will. The State counters that the Defendant has waived consideration of this issue by failing to cite relevant authority in his brief and that the trial court did not err in denying the motion for a mistrial.

At a pretrial hearing, the defense made a motion in limine regarding the admissibility of unspecified bank records that were designated as potential exhibits. The defense requested that "admissibility be subject to a predicate being laid that shows that [the Defendant] knew about that." The defense argued that in the absence of "evidence that [the Defendant] knew about those bank records or his residual effect in it, then it's completely irrelevant." The court ruled as follows:

> I think there needs to be some evidence that he knew that he was – of course, he's – I guess he's the only child? He's the only child.
>
>      . . . .

-67-

[The Defendant is] the only heir. But I think there needs to be some evidence that he knew about that because it could be – there's a substantial amount of money that would go to him as the only heir and dependent, you know. It depends what kind of will – and we don't know if he knew – I don't know if he knew that and I don't know what evidence you have that he knew that it was payable on death to him, so I think you need to provide some kind of evidence before that is admissible, so I'm going to make a note about that.

On direct examination of Rebecca Self, the prosecutor elicited information that the victim had a will, that the Defendant was "[p]retty much" the sole beneficiary, that the Jeep driven by the Defendant as well as the Jeep driven by the victim were titled to the victim, and that the victim paid for various vehicles the Defendant drove. The prosecutor asked if liens existed for the vehicles, and one of the defense attorneys objected to the relevance of the evidence about the will. At the bench conference that followed, the defense moved for a mistrial and proposed that if the court did not grant a mistrial, it should give a curative instruction directing the jury to disregard evidence about a will and assets of the victim's estate. The court instructed the jury to disregard "any testimony elicited from this witness about contents of the will . . . and any inference that the defendant knew anything about the will." At the end of Ms. Self's testimony, the defense objected to the evidence about the will in the absence of proof the Defendant knew about it, argued that the evidence was unfairly prejudicial pursuant to Tennessee Rule of Evidence 403, and moved for a mistrial. The court denied the motion without explaining its rationale.

We address, first, the State's argument that the Defendant waived our consideration of this issue by failing to cite legal authority to support a conclusion the evidence about the Defendant's being the sole beneficiary of the will was inadmissible. As we noted with respect to the State's argument regarding the motion for a mistrial relative to Dr. Brietstein's testimony, this court will not overlook prosecutor's eliciting evidence in violation of a trial court's ruling simply because the State now argues that the defense was tasked with showing that the court's ruling was legally correct. The question in this case is whether the evidence about the Defendant's being the sole beneficiary of the victim's will was elicited in violation of the court's pretrial order and, if so, whether the jury having heard the evidence created a manifest necessity for a mistrial. The Defendant has provided citations in his brief to the relevant law of mistrials, and we will consider the issue on its merits.

We note that the pretrial motion pertained specifically to the admissibility of banking records, with the court ruling that they were inadmissible absent a showing the

Defendant was aware the bank deposits were payable to him upon the victim's death. Although the Defendant characterizes the trial court's ruling as prohibiting any evidence that the Defendant was the victim's sole heir, we view the issue raised by the defense in its pretrial motion and the court's ruling on this motion as addressing the admissibility of specific banking records as exhibits. Nothing else at trial suggested that the Defendant shot the victim for financial gain, and other evidence supported the conclusion that the victim provided for the Defendant financially. In any event, the trial court gave a curative instruction that directed the jury to disregard Ms. Self's testimony about the will and its provisions. We presume that the jury followed the court's instructions. *See, e.g.*, *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006) ("The jury is presumed to follow its instructions."); *State v.* Shaw, 37 S.W.3d 900, 904 (Tenn. 2001). Upon review, we conclude that the record does not establish the existence of a manifest necessity for a mistrial and that the trial court did not abuse its discretion in denying the Defendant's mistrial motion. The Defendant is not entitled to relief on this basis.

### C. Reference to "The Victim"

The Defendant contends that the trial court erred in denying his motion for a mistrial after Detective Fincher referred to "the victim," despite a pretrial order that the term not be used. The Defendant argues that the impact of this testimony was compounded by the jury's having been informed about and "persuasively encouraged" to contribute their juror fees to the victims' compensation fund, thereby suggesting that the court "was somehow on the side of" the victim, but not the Defendant. He also argues that he was deprived of his right to due process and a fair trial. The State counters that the Defendant has waived our consideration of any issues related to Detective Fincher's reference to "the victim" and, alternatively, that the reference to "the victim" was not improper.

The record contains a pretrial order directing that the word "victim" and "victim's" be removed from the State's exhibits and that the State's witnesses not use this language. The record reflects that in describing the scene, Detective Fincher referred to "the victim's bedroom." At a bench conference, the prosecutor indicated that the witness had been instructed not to refer to the victim in this manner in front of the jury and that the prosecutor would again instruct the witness. The defense moved for a mistrial, noting both Detective Fincher's testimony and the court clerk's having informed the jury about the victims' compensation fund and "told stories about how it helped victims." The court denied the motion for mistrial without elaboration.

We begin with the State's argument that the Defendant has waived our consideration of the mistrial issue by failing to cite authority supporting exclusion of the evidence. As we have stated previously, we are underwhelmed by the extension of this

argument – that this court should overlook a prosecutor's violating a court order if the trial court's legal basis for the order was in error. The Defendant's brief contains citations to authority relative to the law of mistrials, and we will consider the merits of the issue.

In his brief, the Defendant has identified a single instance of a witness referring to "the victim's bedroom" during the lengthy trial, the evidentiary portion alone lasting for six days. We cannot conclude, as the Defendant suggests, that this single violation of the court's pretrial order created a manifest necessity for a mistrial.

Regarding the Defendant's argument that the combination of the single reference to "the victim" and the court clerk's earlier discussion of the victims' compensation fund, we note that this portion of the proceedings was not transcribed. The affidavits of defense counsel state that before jury selection began, the court clerk addressed the venire and offered them the opportunity to donate the compensation they received for jury service to a fund used for victims' compensation. The affidavits state that the clerk told an unspecified "touching story" about a victim receiving compensation from the fund.

The State argues that the Defendant failed to preserve the constitutional issue by posing a contemporaneous objection when the clerk made the statements and that the defense's raising the issue much later during the trial was inadequate to preserve it for appeal. We view the Defendant's complaint as being that, given the previous statements by the clerk, Detective Fincher's later reference to the "the victim" gave rise to a constitutional violation. We acknowledge that the defense did not specifically allege a constitutional violation at the time counsel made the motion for a mistrial. Counsel did, however, reference the previous occurrence with the clerk in requesting a mistrial, and the constitutional issue was raised in the motion for a new trial. We do not view the issue as having been waived.

That said, we conclude that the Defendant has not shown a constitutional shortcoming. As we have stated, the Defendant's complaint pertains to a single reference to "the victim" during six days of testimony. Having reviewed the entire record, we are unpersuaded that any request for the jurors to donate their juror compensation to the victims' compensation fund combined with Detective Fincher's testimony so tainted the process as to deprive the Defendant of his constitutional right to due process and a fair trial. The Defendant is not entitled to relief on this basis.

## VI

## UNPRESERVED EVIDENCE

The Defendant contends that the trial court erred in denying his motion to dismiss and motion for a mistrial based upon the State's failure to preserve alarm clocks from the victim's bedroom. The State contends that the court properly denied the motion to dismiss because it had no duty to preserve items that the police did not collect as evidence and that the complaint regarding the motion for a mistrial is waived because the Defendant's brief is inadequate.

The Defendant contends that the trial court erred in denying his motion to dismiss after evidence was introduced relative to the alarms set on the two clocks in the victim's bedroom. He argues that the State had a duty to preserve the clocks pursuant to the Due Process Clause and *State v. Ferguson*, 2 S.W.3d 912, 917 (Tenn. 1999). The State contends that the State had no duty to preserve evidence it did not collect.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady*, 373 U.S. at 87.

With regard to the State's argument that it had no duty to preserve evidence it did not collect, our supreme court has held that the State has a duty to preserve discoverable evidence when the evidence

> might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Ferguson*, 2 S.W.3d at 917 (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)); *see* Tenn. R. Crim. P. 16 (discoverable evidence); *see State v. Merriman*, 410 S.W.3d 770, 779 (Tenn. 2013). The supreme court has said that the proper inquiry involves, first, determination of whether the State had a duty to preserve the evidence. *Ferguson*, 2 S.W.3d at 917. If the State failed to fulfill the duty, three factors must be considered:

-71-

1.  The degree of negligence involved;

2.  The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3.  The sufficiency of the other evidence used at trial to support the conviction.

*Id.* The supreme court has said that in evaluating these factors:

> [T]he central objective is to protect the defendant's right to a fundamentally fair trial. If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges. Dismissal is, however, but one of the trial judge's options. The trial judge may craft such orders as may be appropriate to protect the defendant's fair trial rights. As an example, the trial judge may determine, under the facts and circumstances of the case, that the defendant's rights would best be protected by a jury instruction.

*Id.*

In the present homicide case, the scene had been staged to appear as if the victim had been shot during a burglary. A clock's alarm was sounding and notifications or ringing from two cell phones were heard when the police arrived at the scene. The time of the killing, regardless of whether it was committed during a burglary, was evidence that might be expected to play a material role in a suspect's defense. The time for which the sounding alarm was set was evidence that could indicate the shooting occurred before the alarms sounded. Some of the law enforcement witnesses testified that they heard a clock's alarm when they arrived, and the evidence showed the clock was on a bedside table with two cell phones. The record reflects that Agent Carlisle preserved information about the time for which both clocks' alarms were set, that the clock from the left side of the bed was photographed on the table, and that Agent Carlisle saw no evidentiary value to the clocks themselves. After the motion for a mistrial, the defense made an offer of proof. Agent Carlisle testified that she could not recall if the clocks were plugged in or battery-operated, that she did not document the alarm settings with photographs, and that she did not know if the clocks had more than one alarm or if they had a "snooze" function.

While the fact that the clocks both had alarms programmed to sound that afternoon could lead to an inference regarding the time of death based on the fact that one alarm

was sounding when the body was discovered, the Defendant has not demonstrated that the clocks, as tangible objects, were constitutionally material. We note that it is not even clear that the clocks could have been collected without destroying the information they contained, because it is unclear if they were operating through an electrical plug. While Agent Carlisle could have photographed the screen of the clock showing the alarm time, she chose instead to collect the evidence regarding the alarms by writing down the information, and we cannot say that a different method of collecting this evidence was constitutionally required. We conclude that the State did not have a duty to preserve the clocks. We note concomitantly that the State did preserve the information contained on the clocks. Because no obligation existed to preserve the clocks as tangible objects, consideration of the remaining *Ferguson* factors is not required. *Ferguson*, 2 S.W.3d at 917. The trial court did not err in denying the motion to dismiss on this basis.

In reaching our conclusion, we acknowledge that although Agent Carlisle preserved the time for which the alarms were set in her notes, she did not include the information in her report, and the TBI failed to provide her notes to the district attorney's office. In Section IV, we addressed the State's failure to disclose the information about the alarm times and the trial court's denial of the Defendant's motion for a mistrial on this basis. We do not condone the State's failure to provide the defense with the discoverable information gathered from the clocks. However, its failure to provide discoverable information does not give rise to a *Ferguson* violation where no obligation to preserve the clocks existed. The Defendant is not entitled to relief on this basis.

Because we have concluded that there was no *Ferguson* violation, the defendant's argument that the trial court erred in denying a mistrial on this basis likewise does not entitle him to relief.

## VII

## EVIDENTIARY RULINGS

The Defendant contends that the trial court erred in admitting evidence of the Defendant and the victim's good relationship. His complaints pertain to (1) testimony during the State's case-in-chief of the Defendant and the victim's having a loving relationship and the lack of any suspicion the Defendant was abused by the victim and (2) admission, during the State's rebuttal proof, of a birthday card the victim gave the Defendant. The State contends that appellate consideration is waived because the Defendant failed to make proper objections at trial and in the motion for a new trial and that the Defendant is not entitled to plain error relief.

Evidence is relevant and generally admissible when it has "any tendency to make

the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

### A. <u>Loving Relationship and Lack of Abuse</u>

The Defendant contends that the trial court erred in permitting the State to offer evidence during its case-in-chief via Captain Crum, Captain Dyke, Chuck Jeffers, and William Storm Wilson to show that the victim and the Defendant shared a loving father-son relationship and that these witnesses never saw evidence that the victim abused the Defendant. The Defendant likewise complains about related testimony during the State's case-in-chief from C.P. that she never suspected or was told by the Defendant that he was abused by the victim and testimony from Rebecca Self that she only saw bruises on the Defendant's body during wrestling season. The Defendant argues that this evidence was inadmissible before the Defendant offered evidence of the existence of abuse and that the court should have excluded the evidence pursuant to Tennessee Rule of Evidence 403. The State argues that the Defendant waived our consideration of this issue as to all witnesses except Captain Crum by failing to make contemporaneous objections to the other witnesses' testimony and by failing to identify any witnesses or a legal basis for the objection in the motion for a new trial.

The record reflects that Captain Crum was the first witness to testify in the State's case-in-chief. During direct examination, the State questioned him about whether he and the victim had been friends and how long they worked together with Captain Crum being the victim's superior officer. Defense counsel objected on the basis of irrelevance. The prosecutor argued that the questioning was relevant "with what the defense has raised." The court overruled the objection, and the prosecutor questioned the witness about the victim and the Defendant's relationship and any signs of abuse.

Tennessee Rule of Evidence 103(a) provides:

**Rulings on evidence. --** (a) Effect of Erroneous Ruling. – Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(1) Objection. – In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific

ground of objection if the specific ground was not apparent from the context; or

(2) Offer of Proof. – In case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context. Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.

The record reflects that defense counsel objected to evidence about the victim and the Defendant's relationship and evidence of abuse, but the trial court overruled the objection. Contrary to the State's argument in its brief, the Defendant was not required to make repetitive objections in order to preserve the objection. *See* Tenn. R. Evid. 103(a)(2). We have reviewed the motion for a new trial, and the issue is sufficiently stated. We will consider the issue on its merits.

The Defendant contends that the trial court should have sustained the objection because the issue of abuse had not been raised except in the Defendant's opening statement. He notes that opening statements are not evidence and argues that the State should have been limited to offering evidence of this nature to rebut defense evidence that the Defendant had been abused by the victim.

The State argues that the evidence was relevant to the Defendant's claims of abuse in his pretrial statement to law enforcement, which was offered as evidence during the State's case-in-chief. The State also argues that the evidence was relevant to the Defendant's mens rea, motive, and the lack of provocation, which the State argues were material issues during its case-in-chief.

As the Defendant correctly notes, opening statements are not evidence. *See State v. Thompson*, 43 S.W.3d 516, 523 (Tenn. Crim. App. 2000). In his argument that the evidence was inadmissible in the State's case-in-chief, he relies on cases involving improperly admitted rebuttal evidence pursuant to Tennessee Rules of Evidence 404(a)(2) and 404(b). Here, the State was not arguing that the evidence was admissible under Rule 404 to establish that the Defendant acted in conformity with a character trait by shooting his father in an act consistent with their loving relationship. Accordingly, the cases cited by the Defendant do not control the admissibility of the evidence. *See State v. Copenny*, 888 S.W.2d 450, 455 (Tenn. Crim. App. 1993) (concluding that evidence that the defendant may have fired on the victim prior to the killing was improper and irrelevant as evidence of the victim's reputation for peacefulness under Rule 404(a) before the presentation of evidence the victim had been the first aggressor); *State v. Kevin*

*Rudd*, No. W2005-02814-CCA-R3-CD, at *3-7, 2007 WL 2700077 (Tenn. Crim. App. Sept. 13, 2007) (concluding that evidence that the defendant had previously committed a similar shooting should not have been admitted under Rule 404(b) in response to claim in defendant's opening statement that the shooting was an accident because opening statements are not evidence); *State v. Boris Terrell Traylor*, No. 01C01-9104-CR-00124, at *1, 1992 WL 14140 (Tenn. Crim. App. Jan 31, 1992) (concluding that evidence of similar past crimes should not have been admitted under Rule 404(b) in response to opening statement, which did not constitute evidence).

To obtain a conviction on the charges, the State had to establish that the Defendant committed an intentional and premeditated killing, in which his conscious objective or desire was the victim's death and in which the victim was killed after the exercise of reflection and judgment. *See* T.C.A. §§ 39-13-201, -202, 39-11-106(a)(18). The State sought to admit the evidence of the victim's loving relationship with the Defendant as relevant to the Defendant's mens rea, motive, and the victim's lack of provocation. *See Finch v. State*, 226 S.W.3d 307, 318 (Tenn. 2007) (lack of provocation may support an inference of premeditation). During the State's case-in-chief, the evidence of the relationship between the Defendant and the victim was relevant to and probative of the truthfulness of the Defendant's pretrial account of the killing, which was also part of the State's proof-in-chief, and of the Defendant's mental state at the time of the killing. Accordingly, the evidence had a tendency to make the existence of premeditation more probable or less probable than it would be without the evidence, and it passes the basic test of relevancy. *See* Tenn. R. Evid. 401, 402.

The remaining question is whether the evidence should have been excluded pursuant to Tennessee Rule of Evidence 403. This rule provides that, despite its relevance, evidence

> may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403. The Defendant's argument in this regard is simply that by presenting the evidence during its case-in-chief, the State was given the opportunity to defuse the defense theory before the defense presented it. The Defendant has not identified any legal basis for exclusion of the evidence pursuant to Rule 403. The probative value of the evidence was high and was not substantially outweighed by the dangers enumerated in Rule 403. The Defendant is not entitled to relief on this basis.

## B.  Birthday Card

The Defendant contends that his right to due process was violated when the State was permitted, during its rebuttal proof, to offer evidence of an affectionate birthday card from the victim to the Defendant.  The Defendant has not identified an evidentiary basis for exclusion of the card and argues that the process was unfair because the State was allowed to present evidence during its case-in-chief that the Defendant and the victim had a good relationship and was able to present "the most emotionally-resonant evidence on that point" during its rebuttal proof.  The State counters that the Defendant waived the issue by failing to raise a due process issue in his trial objection and in the motion for a new trial.  The State has not addressed the issue on its merits.

The record reflects that the defense filed a motion in limine to exclude the birthday card because it was irrelevant and contained hearsay.  At the close of the State's case-in-chief, the defense filed a pleading titled "Defendant's Offer to the State to Re-open Its Case-in-Chief."  The pleading stated, "This offer is made to prevent the State from waiting until rebuttal to offer witnesses or evidence that was relevant to issues raised in opening statements and during the State[']s case in chief."  During an in-chambers conference, defense counsel argued that the motion had been filed out of concern the State would "sandbag" the defense by reserving evidence for rebuttal proof after having already presented evidence during its case-in-chief about the victim and the Defendant's good relationship.  The prosecutor mentioned the birthday card as possible rebuttal evidence, and the court ruled that it might become admissible rebuttal evidence depending upon the proof presented by the Defendant.  From the prosecutor's statements during the in-chambers conference, it appears that the court had ruled at an earlier date the card might be admissible as rebuttal evidence.  Thereafter, when the State offered the birthday card as rebuttal evidence, the defense objected without stating a basis for the objection.  The Defendant's motion for a new trial alleges that the trial court erred in admitting the birthday card as rebuttal evidence because the card was relevant to evidence presented during the State's case-in-chief and should have been presented at that time, but the Defendant did not identify a legal basis for this assertion.

The issue is waived.  The Defendant failed to identify due process at trial and in his motion for a new trial as a basis for his objection.  *See* Tenn. R. App. P. 36(a).  Therefore, our review is limited to the question of whether plain error occurred.

In that regard, five factors are relevant

> when deciding whether an error constitutes "plain error" in
> the absence of an objection at trial: "(a) the record must
> clearly establish what occurred in the trial court; (b) a clear

and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

The Defendant cannot prevail on this issue because he has not shown that a clear and unequivocal rule of law was breached, that a substantial right was adversely affected, or that consideration is necessary to do substantial justice. A trial court may, within its discretion, permit the State to introduce rebuttal evidence which was properly the subject of its case-in-chief. *Johnson v. State*, 469 S.W.2d 529, 529 (Tenn. Crim. App. 1971).

We are unpersuaded by the Defendant's citation to *State v. West*, 825 S.W.2d 695, 698 (Tenn. Crim. App. 1992), in which this court held that the defendant was entitled to a new trial because the State called a compelling rebuttal witness whose identity had not been revealed to the defendant before the trial, despite the State's knowledge of her existence. The situation in the present case is factually distinguishable from *West*. In the present case, the Defendant was aware of the birthday card as a potential exhibit, and its admissibility appears to have been litigated before the trial. Because no plain error appears, the Defendant is not entitled to relief on this basis.

## VIII

### PROCEDURE RELATED TO GUN INSPECTION

The Defendant contends that the trial court erred in the procedure by which the court and the jury inspected the gun used in the victim's homicide. He argues that his rights to due process, to confront witnesses, and to a jury trial were violated when the jury was permitted to handle the gun and pull the trigger and by jurors' speaking directly to the witness. He also contends that a violation of article 1, section 19 of the Tennessee Constitution, requiring that the courts shall be open, occurred. The State contends that appellate consideration is waived because the Defendant failed to make a

contemporaneous objection to the procedure at the trial and failed to specify a legal basis for an objection in the motion for a new trial. The State also argues that plain error relief is not appropriate.

The record reflects that during his direct examination testimony, Agent Scott stood near the jury box and demonstrated the features and operation of the gun. The demonstration included Agent Scott's demonstrating how the gun would be fired if it contained ammunition. His testimony also included evidence about the amount of "trigger pull" force required to fire the gun and stovepiping caused by "limp wristing." The prosecutor asked that the jury be allowed to examine and pull the trigger, and the defense did not object. The trial court granted the State's request. The court and the jurors examined the gun. As the jurors were examining the gun, a court officer advised the court that a juror wanted to ask a question, which the court instructed the juror to submit in writing. The question was submitted in written form, and the court posed the question to the witness. The defense did not object. Agent Scott stated that a second juror had asked a question, which he had answered, and the juror stated that he asked a question about "the trigger safety." One of the defense attorneys indicated he had heard the question. The defense did not object. In its concluding instructions, the court described the procedure followed for demonstration and examination of the gun and instructed the jury not to base its verdict on the "training" it received from Agent Scott or the manner of the demonstration of the gun and the trigger. In the amended motion for a new trial, the Defendant alleged that his rights to due process and to an open trial were violated when the jurors and Agent Scott spoke to each other off the record and out of the hearing of defense counsel. One of the defense attorneys filed an affidavit stating that he had been unable to hear a juror speaking to Agent Scott during the demonstration and that counsel had been unable to hear Agent Scott's response. Counsel stated that the transcript failed to reflect the exchange.

We conclude that the issue regarding the court's and the jury's examination of the physical evidence is waived because the Defendant failed to make contemporaneous objections. *See* Tenn. R. Evid. 103(a)(1) (requiring a timely objection or motion to strike as a predicate to appellate relief for erroneously admitted or excluded evidence); *see also* Tenn. R. App. P. 36(a) (stating that relief is not required if the party failed to take action that was reasonably available to prevent or nullify the harmful effect of an error). We likewise conclude that the Defendant waived any complaint about counsel's inability to hear the exchange between Agent Scott and a juror. The transcript reflects that although a juror asked a question and Agent Scott answered it, counsel contemporaneously acknowledged having heard the exchange. Counsel did not indicate he had been unable to hear this or any other exchange until months later when he filed his affidavit and motion for a new trial. Had counsel brought the matter to the trial court's attention at the

time it occurred, it could have been addressed promptly. *See* Tenn. R. App. P. 36(a). Our review is limited to consideration of whether plain error exists.

With regard to the examination of the gun, we note that the decision of whether to allow demonstrative evidence is within the trial court's discretion. *See State v. Underwood*, 669 S.W.2d 700, 704 (Tenn. Crim. App. 1984) (concluding that the trial court acted within its discretion in permitting police officers to reenact the defendant's demonstration to them of his commission of the offense). We note, likewise, that this court has recognized that in appropriate cases, the probative value of allowing jurors to examine a weapon and pull the trigger outweighs the danger of unfair prejudice. *See State v. Coulter*, 67 S.W.3d 3, 56-57 (Tenn. Crim. App. 2001), *disagreed with on other grounds by State v. Jackson*, 173 S.W.3d 401, 407 n.3 (Tenn. 2005); *see also State v. Donald Korpan*, No. 89-261-III, 1991 WL 1345, at *9 (Tenn. Crim. App. Jan. 11, 1991). The Defendant argues that he was "confronted with information (presented both to the thirteenth juror and to the *petit* jury) which he was given no discovery regarding and which he had no real opportunity to challenge." He has not explained the nature of this undisclosed evidence or its import to the case, nor has he explained how he suffered any constitutional deprivation. He has not shown that a clear and unequivocal rule of law was breached, that a substantial right was adversely affected, or that consideration is necessary to do substantial justice. Plain error relief is not required.

With regard to the alleged exchange between Agent Scott and a juror which counsel belatedly asserted he had been unable to hear, the record reflects that at least one juror had an exchange with Agent Scott directly and that a second juror submitted a written question for Agent Scott to the court. We acknowledge that the prescribed procedure for jurors' questions for witnesses was not followed with regard to the verbal exchange. *See* Tenn. R. Crim. P. 24.1(c). The juror stated that he "just asked about the trigger safety," and defense counsel acknowledged having heard the exchange and that "that was the question." Agent Scott then demonstrated for the entire jury and the court the "small hinged insert in the face of the trigger" that functioned as the trigger safety. No further evidence was presented at the motion for a new trial hearing regarding the substance of the exchange. The defense does not claim that the juror was exposed to any particular extraneous prejudicial information as a result of the off-record exchange. The record is unclear, but it appears that the information given to the individual juror was then repeated for the trial court and the jury as a whole. Because the record fails to reflect clearly what occurred in the trial court, plain error relief is not appropriate. *See Smith*, 24 S.W.3d at 282.

# IX

## PROPRIETY OF CLOSING ARGUMENT

The Defendant contends that prosecutorial misconduct occurred during the State's rebuttal argument when the prosecutor characterized the Defendant's shooting the sleeping victim in the back of the head as "cold" while the prosecutor displayed a montage of images that included a photograph of the victim's body at the scene and the birthday card from the victim to the Defendant. The State contends that the issue is waived because the Defendant failed to state a basis for his objections at the trial and that plain error relief is not required.

The record reflects the following excerpt from the State's rebuttal argument:

[PROSECUTOR:] Ladies and gentlemen of the jury, that's Roger Self. That's the bullet hole in the back of the head caused by that man. He said it's an accident, I wasn't pointing the gun. You all saw pictures of that room and you will be able to see pictures of that room again. Take a look at the size of that room. Of anywhere else in the bedroom, if he said he just jerked and the gun just went off, look where it hit, look where it hit. Could have hit the bedpost, could have hit one of the chest of drawers, could have hit one of the clocks, could have hit the wall, just could have hit the bed. It didn't. It hit his dad in the back of the head. And he said he turned the light on when he walked into that room so he could see where his father was laying.

Your Honor, if the Court please, ladies and gentlemen, the statement of Mr. Ethan Self, he said he was six to eight feet from his father when he walked in the door and I have this set on eight feet, this is the furthest he said he was away, could have been closer, six, six feet with the light on with his father laying in the bed snoring. We will take it back out to eight. He is holding this firearm, I won't point it at this officer but he is holding this firearm this far, whether it is up close or out and he pulls that trigger with the light on. He goes up and checks according to one of the doctors and says, look[s] bad, think dad is dead and he finally admitted, yeah, dad was dead. Then he lied to everybody else after that.

In closing, he had the [wherewithal] to think, other than covers being pulled down, that's what Ethan Self saw that night. I want you to think about something and think about it hard. He knew he had shot and killed his father, he knew that. You saw pictures and you can take them back and

look at them. After his father was dead with a bullet hole in the back of his head, bleeding, he ransacks his bedroom. How do we know that?

[DEFENSE COUNSEL]: You Honor, we object to putting the picture up there with this card that we have already objected to, that's just totally improper, it has no purpose whatsoever.

THE COURT: Which one? I am saying are you going to refer to all of them?

[PROSECUTOR]: Yes, sir.

THE COURT: All right.

[DEFENSE COUNSEL]: In one picture? That can only be played to the jury's prejudice and sympathy.

THE COURT: Go ahead.

[PROSECUTOR]: Yes, sir. My point being, ladies and gentlemen of the jury, his dad is laying there dead. He says he accidentally just shot him because he had this sudden impulse and it just went off. He stays in that room or he goes back into that room at some point in time and he ransacks his dead father's bedroom while he is laying there dead. That's cold.

[DEFENSE COUNSEL]: I object, Your Honor.

THE COURT: Go ahead.

[PROSECUTOR]: He goes through the rest of the house and ransacks it and the entire time according to his time frame, he is keeping this pistol with him because he knows he has got to get rid of it after he does this. Now you tell me and you ask yourselves when you go back and deliberate, accident, intentional killing. They have made Roger Self out to be a monster. Ethan, I'm so very proud of you, love Daddy. Ethan to [C.P.], dad is gone. He is gone because of that man.

I ask that you go back with the evidence and the instructions that the Judge is going to give you and you find Mr. Ethan Self guilty of premeditated, intentional first degree murder.

The Defendant states in his brief that a "montage of photographs" was displayed during the argument, but the record is silent as to the contents of any such montage other than to support a conclusion that a photograph of the victim and the birthday card were displayed during the rebuttal argument.

We begin our analysis with the State's argument that the Defendant waived our consideration of the issue by failing to state a legal basis for the objections, by failing to challenge specifically the prosecutor's "cold" characterization of the Defendant's actions in the motion for a new trial, and by failing to specify a legal basis in the motion for a new trial for the objection to the birthday card. In order to preserve an issue regarding prosecutorial misconduct, a defendant must make a contemporaneous objection at the trial. *See, e.g.*, *State v. Thomas*, 158 S.W.3d 361, 412 (Tenn. 2005). The record reflects that the defense made contemporaneous objections to the photographs and the "cold" characterization and that it is apparent from the context that his objections were based upon alleged improper argument. We will consider the issue on its merits.

The purpose of closing arguments is "to sharpen and clarify the issues." *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008) (citing *Herring v. New York*, 422 U.S. 853, 862 (1975)). Parties are generally afforded wide latitude in their arguments. *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999). "Argument must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *Id.* The trial court is afforded wide discretion in controlling the arguments, and an appellate court will not disturb a lower court's ruling absent a showing of abuse of discretion. *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. 2003).

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7-106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See* [*State v.*] *Cauthern*, 967 S.W.2d

[726, 737 (Tenn. 1998]; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Standards Relating To The Prosecution Function And The Defense Function §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

*Goltz*, 111 S.W.3d at 6.

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). In determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.

The Defendant's complaints about the evidence fall within the third *Goltz* category regarding argument designed to inflame the passions or prejudices of the jury. *See Goltz*, 111 S.W.3d at 6. The pivotal issue in the case was whether the Defendant committed a premeditated and intentional killing or whether he accidentally shot the victim. In its rebuttal argument, the State highlighted the inconsistencies between its proof of a loving relationship between the Defendant and the victim and the Defendant's account of a controlling, abusive, unloving father. Whether the Defendant suffered from PTSD as a result of abuse and whether an involuntary startle response from the PTSD caused him to fire the gun accidentally were essential inquiries in determining whether the shooting was

-84-

premeditated and intentional or whether it was accidental. The State's argument that the Defendant's actions immediately after shooting the victim were "cold" addressed the Defendant's mental state. Both the birthday card and the photograph of the deceased victim from the scene were received as exhibits during the trial and were relevant to the issues to be determined by the jury. The record does not reflect, and the Defendant has not argued, that the manner in which the previously admitted exhibits were displayed during closing argument created any inherent prejudice, and none is apparent. We are likewise unpersuaded that the prosecutor's argument relative to a photograph of the victim and the birthday card was designed to inflame the jury's passions or prejudices. As we have stated, the probative value of these exhibits relative to the questions at issue was high.

With regard to the argument that the victim's actions after the shooting were "cold," we cannot conclude that the argument was designed to inflame the passions or prejudices of the jury, given the issues to be determined. In *State v. Howard Hawk Willis*, No. E2012-01313-CCA-R3-DD, 2015 WL 1207859, at *85-86 (Tenn. Crim. App. Mar. 13, 2015), *app. argued* (Tenn. Oct. 1, 2015), the prosecutor made various arguments about the defendant's coldness relative to the victims and the homicides. The defendant objected to the characterizations as impermissible statements of personal opinion and therefore as constituting prosecutorial misconduct, and this court disagreed. *Id.* at *86. This court reasoned, "[T]he prosecutor argued that appellant's mental state could be inferred from the evidence, which is permissible." *Id.* In the present case, the State's rebuttal argument included the theory that the Defendant's coldness after the killing, as evidenced by his actions, demonstrated that the killing had been premeditated and intentional. The argument was pertinent and was not inflammatory.

In evaluating the rebuttal argument, we note, as well, that both the prosecutor's argument about the nature of the Defendant's actions and the display of the photograph and birthday card were responsive to the Defendant's closing argument. *See Judge*, 539 S.W.2d at 344; *see Goltz*, 111 S.W.3d at 5-6. For these reasons, we conclude that the Defendant has not shown that prosecutorial misconduct occurred. He is not entitled to relief on this basis.

## X

## JURY INSTRUCTIONS

The Defendant contends that the trial court erred because it failed to instruct the jury on self-defense and declined to give the requested jury instruction regarding the State's failure to preserve the alarm clocks. The State contends that the Defendant waived appellate consideration of the self-defense instruction issue by failing to submit a

written request for the instruction at the trial and by failing to cite any legal authority in his motion for a new trial and that plain error relief is not warranted. Relative to the requested special instruction, the State contends that the court did not err by giving the pattern instruction on lost or unpreserved evidence instead of the Defendant's requested special instruction.

## A. Self-Defense Instruction

In his reply brief, the Defendant has not responded to the State's argument that he waived the issue as to the self-defense instruction by failing to make a written or oral request for the instruction and by failing to cite legal authority for the instruction in his motion for a new trial. The record reflects that the Defendant asked the court if it planned to give a self-defense instruction, which we interpret as a timely request for a self-defense instruction. The Defendant did not submit a written request. The issue was raised in the motion for a new trial and the amended motion for a new trial, and contrary to the State's assertion that the Defendant did not raise a legal basis for the alleged error, the Defendant alleged in the motion for a new trial that the trial court's failure to give the instruction violated the Defendant's right to due process.

We agree with the State that, as a general principle, written requests for jury instructions, in many cases, are required. *See* T.C.A. § 40-18-110(c) (2012) (requiring that all requests for lesser included offense instructions be submitted in writing); Tenn. R. Crim. P. 30(a) (stating that "any party may file written requests" for special jury instructions at the close of the evidence or at such earlier time as the trial court directs); *State v. Mackey*, 638 S.W.2d 830, 836 (Tenn. Crim. App. 1982) (holding that appellate review was waived of issue related to trial court's denial of defendant's request for an intoxication instruction because the request was not made in writing). The requirement of a written request is inapplicable, however, if a fundamental defense is involved. *State v. Eddie Leroy Rowlett*, No. M2011-00485-CCA-R3-CD, 2013 WL 749502 (Tenn. Crim. App. Feb. 26, 2013) (stating that Tenn. R. Crim. P. 30(a) is inapplicable when a fundamental defense is involved); *see Morrison v. State*, 371 S.W.2d 441, 443-45 (Tenn. 1963) (concluding that, notwithstanding defendant's failure to make a written request for a self-defense instruction, the trial court erred by failing to give the instruction); *State v. Dorie Miller Currin*, No. 02C01-9201-CC-00018, 1992 WL 205276, at *3 (Tenn. Crim. App. Aug. 26, 1992) (concluding that a request for a self-defense instruction is not required to be made in writing). The lack of a written request is not fatal in this case, and we will consider the issue on its merits.

A criminal defendant has "a right to a correct and complete charge of the law." *State v. Hanson*, 279 S.W.3d 265, 280 (Tenn. 2009) (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury

-86-

instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). A jury instruction related to general defenses, including self-defense, is not required to be submitted to the jury "unless it is fairly raised by the proof." T.C.A. § 39-11-203(c) (2014). An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34.

Our supreme court has concluded that sufficient evidence to fairly raise a general defense "is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129. A trial court's determination in this regard "must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor." *Id.*; *see State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001); *Johnson v. State*, 531 S.W.2d 558, 559 (Tenn. 1975); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998); *see also State v. Shropshire*, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). If evidence has been presented which reasonable minds could accept as a defense, "the accused is entitled to appropriate instructions." *Johnson*, 531 S.W.2d at 559.

When the evidence presented at the trial fairly raises a general defense, the trial court is required to provide the jury with the appropriate instruction. *Hawkins*, 406 S.W.3d at 129. A jury instruction, though, is "prejudicially erroneous only if the . . . charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). Whether a jury instruction was proper is a mixed question of law and fact that is reviewed de novo without a presumption of correctness. *State v. Fayne*, 451 S.W.3d 362, 373 (Tenn. 2014).

As pertinent to this appeal, a person acts in self-defense when the person

> is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

> (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2)(A)-(C) (2012) (amended 2014).

The Defendant contends that the failure to give a self-defense instruction was error because the jury could have concluded from the evidence that the Defendant thought he would be attacked and beaten for deciding to leave home, that the Defendant believed such an attack was imminent, and that the Defendant shot the victim in order to prevent the attack. The State argues that no reasonable juror could conclude that the Defendant reasonably believed that he was in danger of death or serious bodily injury when he shot the unarmed, sleeping victim. Viewing the evidence in the light most favorable to the Defendant, we cannot conclude that self-defense was fairly raised by the proof. The issue was whether the victim died as a result of a premeditated and intentional shooting or whether the Defendant shot him accidentally. We acknowledge that proof existed of recent confrontations and physical abuse by the victim against the Defendant. We note, though, the uncontested proof that the unarmed victim was asleep when the Defendant shot him. No proof exists to show the sleeping, unarmed victim posed any immediate threat of death or serious bodily injury to the Defendant. The trial court did not err in declining to give a self-defense instruction, and the Defendant is not entitled to relief on this basis.

## B. **Unpreserved Evidence**

The Defendant's second jury instruction issue relates to the instruction relative to the State's failure to preserve the alarm clocks from the victim's bedroom. The Defendant submitted a written request for a special instruction, which the trial court declined to give. Instead, the court gave the pattern jury instruction relative to unpreserved evidence. The State contends that the trial court properly instructed the jury.

The record reflects that the Defendant requested that the trial court give the following special instruction:

> You are instructed that there is a duty on the State to preserve evidence. In this case you have heard testimony about an alarm clock and that alarm clock was not preserved as evidence to determine whether or not it had two or more alarm settings.
>
> You may draw an adverse inference from the fact that the alarm clock was not preserved as evidence. In this regard you should consider

-88-

any testimony about that alarm clock with caution and you are entitled to disregard that testimony in its entirety.

Instead, the trial court gave the following instruction:

The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of such a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.

If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are in issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

7 Tennessee Practice Pattern Jury Instructions -- Criminal 42.23 (19th ed. 2015) (footnote omitted); *see Ferguson*, 2 S.W.3d at 917, n.11.

A special instruction is unnecessary when the charge "fully and fairly sets forth the law." *Fayne*, 451 S.W.3d at 373. A trial court errs in denying a request for a special instruction only when the charged instruction does not "fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998); *see Fayne*, 451 S.W.3d at 373.

Upon review, we conclude that the pattern instruction fully and fairly explained the relevant law to the jury. The trial court did not err in declining to give the requested special instruction. The Defendant is not entitled to relief on this basis.

## XI

## CUMULATIVE ERROR

The Defendant contends that cumulative trial error necessitates a new trial. The State contends that the Defendant waived the issue by failing to provide adequate citations to the record and to legal authorities and that the Defendant failed to establish any errors occurred.

Although the Defendant made only a cursory argument relative to this issue, he alleged specific individual errors, which are discussed at length elsewhere in his brief. We will consider the merits of the issue.

"The cumulative error doctrine exists to protect a criminal defendant's state and federal constitutional right to a fair trial." *State v. Herron*, 461 S.W.3d 890, 909 (Tenn. 2015) (citing *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010)).

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

*Hester*, 324 S.W.3d at 76. This court applies cumulative error analysis when two or more errors existed during the trial court proceedings. *Id*. at 77. We have concluded that none of the issues raised by the defendant amounted to error, and the Defendant is therefore not entitled to relief under the theory of cumulative error.

## XII

## SENTENCING

The Defendant contends that the trial court improperly sentenced the Defendant because it did not impose his life sentence pursuant to Tennessee Code Annotated section 40-35-501(h)(1), providing for parole eligibility after twenty-five years. The State contends that the issue is not properly before the court because release eligibility claims are not properly considered in an appeal of the conviction and that, in any event, the Defendant committed the offense after July 1, 1995, and was properly sentenced pursuant to section 40-35-501(i)(1), applicable to offenses committed on or after that date. We conclude that the Defendant is not entitled to relief.

Tennessee Code Annotated section 40-35-501(h)(1) (Supp. 2009) (amended 2010, 2012, 2013, 2014, 2015) provides:

> Release eligibility for each defendant receiving a sentence of imprisonment for life for first degree murder shall occur after service of sixty percent

(60%) of sixty (60) years less sentence credits earned and retained by the defendant, but in no event shall a defendant sentenced to imprisonment for life be eligible for parole until the defendant has served a minimum of twenty-five (25) full calendar years of the sentence, notwithstanding the governor's power to reduce prison overcrowding pursuant to title 41, chapter 1, part 5, any sentence reduction credits authorized by § 41-21-236 or any other provision of law relating to sentence credits. A defendant receiving a sentence of imprisonment for life for first degree murder shall be entitled to earn and retain sentence credits, but the credits shall not operate to make the defendant eligible for release prior to the service of twenty-five (25) full calendar years.

Code section 40-35-501(i)(1) and (2) provide:

(1)    There shall be no release eligibility for a person committing an offense, on or after July 1, 1995, that is enumerated in subdivision (i)(2). The person shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained. However, no sentence reduction credits authorized by § 41-21-236 or any other provision of law, shall operate to reduce the sentence imposed by the court by more than fifteen percent (15%).

(2)  The offenses to which subdivision (i)(1) applies are:

(A)  Murder in the first degree;

(B)  Murder in the second degree;

(C)  Especially aggravated kidnapping;

(D)  Aggravated kidnapping;

(E)  Especially aggravated robbery;

(F)  Aggravated rape;

(G)  Rape;

(H)  Aggravated sexual battery;

(I)  Rape of a child;

(J)  Aggravated arson;

(K)  Aggravated child abuse;

(L)  Aggravated rape of a child;

(M)  Sexual exploitation of a minor involving more than one hundred (100) images;

(N)   Aggravated sexual exploitation of a minor involving more than twenty-five (25) images; or

(O)  Especially aggravated sexual exploitation of a minor.

Our supreme court had said that section 40-35-501(h)(1) applies to defendants whose life sentences were imposed for first degree murder offenses committed before July 1, 1995, and that section 40-35-501(i)(1) applies to defendants whose sentenced are for enumerated offenses committed on or after July 1, 1995. *Vaughn v. State*, 202 S.W.3d 106, 118 (Tenn. 2006); *see* Op. Tenn. Att'y Gen. 97-098 (1997).

The preliminary question raised by the State is whether the issue is properly before the court.  It argues that the calculation of a defendant's release eligibility date is the province of the Department of Correction and that any challenge to that calculation must be addressed through the Uniform Administrative Procedures Act.  *See, e.g.*, *Stewart v. Schofield*, 368 S.W.3d 457, 463-67 (Tenn. 2012).  The Defendant filed a post-trial motion alleging that pursuant to Tennessee Rule of Criminal Procedure 35, he should be sentenced under subsection (h)(1) and that he was entitled to a new trial on this basis.  He argued the motion at the hearing on the motion for a new trial.  The trial court filed an order denying the motion for a new trial without stating its findings and conclusions as to the issues raised, and it did not address them at the hearing.

Regarding the State's contention that this issue is a matter of release eligibility determination, we note that a defendant whose life sentence is imposed pursuant to section 40-35-501(h)(1) attains release eligibility, that is, eligibility for parole, after a date determined by the Department of Correction.  T.C.A. § 40-35-501(q) (Supp. 2009) (amended 2010, 2012, 2013, 2014) (now codified at subsection (r)).  In contrast, "[t]here shall be no release eligibility for a person committing an offense, on or after July 1, 1995, that is enumerated in subdivision (i)(2)." *Id.* § 40-35-501(i)(1).  In the latter situation,

subsection (i)(1) provides the means for determining the sentence expiration date, and release is not contingent upon a grant of parole. *See Christopher A. Williams v. State*, No. W2013-00555-CCA-R3-HC, 2013 WL 5493568, at *2 (Tenn. Crim. App. Sept. 30, 2013) (noting that the term "life with parole" is inaccurate because a life sentence entitles a defendant to release, not parole, after service of 100 percent of sixty years less any sentences credits, provided the credits do not reduce the sentence by more than fifteen percent, or nine years), *perm. app. denied* (Tenn. Dec. 10, 2013); *Kermit Penley v. State*, No. E2004-00129-CCA-R3-PC, 2004 WL 2439287, at *3 (Tenn. Crim. App. Nov. 1, 2004) ("[A] sentence of life in prison entitles the defendant to be released, as opposed to paroled, after serving 100% of sixty years less any eligible credits, so long as they do not operate to reduce the sentence by more than 15%, or nine years, which would result in a total sentence of fifty-one years."), *perm. app. denied* (Tenn. Feb. 28, 2005).

"Notwithstanding any other provision of the law to the contrary, the [Department of Correction] is responsible for calculating the *sentence expiration date* and the release eligibility date of any felony offender sentences to the department and any felony offender sentenced to confinement in a local jail or workhouse for one (1) or more years." T.C.A. § 40-35-501(q) (Supp. 2009) (amended 2010, 2012, 2013, 2014) (now codified at subsection (r)) (emphasis added). The Defendant's issue pertains to the method to be used to calculate his sentence expiration date. Because the Department of Correction is responsible for calculating his sentence expiration date, the issue was not properly before the trial court and, as a result, is not properly before this court. Challenges to the Department of Correction's determinations are subject to review under the Uniform Administrative Procedures Act. *See generally id.* §§ 4-5-101 to 4-5-325 (2015) (Uniform Administrative Procedures Act). In addition, a defendant who contends he is being held, notwithstanding the expiration of his sentence, may seek immediate release pursuant to a writ of habeas corpus. *See id.* §§ 29-21-101 to 29-21-130 (2012) (habeas corpus proceedings). Because consideration of the issue is not proper in this appeal, the Defendant is not entitled to relief on this basis.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE